IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,092

FAITH RIVERA et al., TOM ALONZO et al., and SUSAN FRICK et al.,
*Appellees*,

v.

SCOTT SCHWAB, Kansas Secretary of State, in His Official Capacity,
and MICHAEL ABBOTT, Wyandotte County Election Commissioner,
in His Official Capacity,
*Appellants*,
and
JAMIE SHEW, Douglas County Clerk,
in His Official Capacity,
*Appellee.*

SYLLABUS BY THE COURT

1.

The Elections Clause in Article I, Section 4 of the United States Constitution does not bar this court from reviewing reapportionment legislation for compliance with the Kansas Constitution.

2.

In this case, the gravamen of plaintiffs' claims sound in equal protection. While the other provisions of the Kansas Constitution relied upon by plaintiffs and the district court—Kan. Const. Bill of Rights, §§ 1, 3, 11, 20; art. 5, § 1—protect vital rights, they do not provide an independent basis for challenging the drawing of district lines.

3.

Section 2 of the Kansas Constitution Bill of Rights is the textual grounding and location of our Constitution's guarantee of equal protection to all citizens.

4.

The equal protection guarantees afforded all Kansans by section 2 of the Kansas Constitution Bill of Rights is coextensive with the equal protection guarantees found in the Fourteenth Amendment to the United States Constitution. Therefore, Kansas courts shall be guided by United States Supreme Court precedent interpreting and applying the equal protection guarantees of the Fourteenth Amendment when we are called upon to interpret and apply the coextensive equal protection guarantees of section 2 of the Kansas Constitution Bill of Rights.

5.

The use of partisan factors in district line drawing is not constitutionally prohibited.

6.

In the absence of express standards codified in either the Kansas Constitution or in Kansas law constraining or limiting the Legislature's use of partisan factors in drawing district lines, we can discern no judicially manageable standards by which to judge a claim that the Legislature relied too heavily on the otherwise lawful factor of partisanship when drawing district lines. As such, the question presented is a political question and is nonjusticiable, at least until such a time as the Legislature or the people of Kansas choose to codify such a standard into law.

7.

Government decision-making based predominantly on race is antithetical to the principles of equal protection enshrined in both the Fourteenth Amendment and in section 2 of the Kansas Constitution Bill of Rights. Section 2 prohibits the drawing of district boundaries on the basis of race unless the Government can show that its action was in furtherance of a compelling state interest and was narrowly tailored to satisfy that interest. Compliance with the federal Voting Rights Act may be a compelling state interest.

8.

The equal protection guarantees found in the Fourteenth Amendment and in section 2 of the Kansas Constitution Bill of Rights protect against two distinct kinds of racial discrimination in the drawing of district lines. First, section 2 protects against racial gerrymandering which occurs when a legislative body uses race as the predominant factor in choosing where to draw the lines. Second, section 2 protects against targeted minority voter dilution which occurs when a legislative body invidiously discriminates against a minority population to minimize or cancel out the potential power of the minority group's collective vote.

9.

The United States Supreme Court has set forth explicit legal tests to be applied to each of the two distinct kinds of racial discrimination claims that allege a particular legislative line-drawing enactment violates equal protection. We expressly adopt those same tests to apply when those challenges are made under section 2 of the Kansas Constitution Bill of Rights.

3

10.

When a claim of racial gerrymandering is made, the plaintiffs must show that race was the predominant factor motivating the Legislature's decision to place a significant number of voters inside or outside of a particular district. To make this showing, a plaintiff must prove that the Legislature subordinated lawful, race-neutral districting factors—such as compactness, respect for political subdivisions, and partisan advantage—to unlawful racial considerations.

11.

When a claim of minority vote dilution is made, the plaintiffs must show that (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single member district; (2) the group is politically cohesive; and (3) there exists sufficient bloc voting by the white majority in the new allegedly diluted districts to usually defeat the preferred candidate of the politically cohesive minority bloc. If a plaintiff fails to establish these three points, there neither has been a wrong nor can there be a remedy. If the plaintiff can establish these three points, the court next inquires whether, as a result of the challenged plan, the plaintiffs do not have an equal opportunity to participate in the political process and to elect candidates of their choice. We review the totality of the circumstances in determining whether a minority group has the opportunity to participate in the political process.

12.

The record below demonstrates that plaintiffs did not ask the district court to apply the correct applicable legal tests to their race-based claims. The district court, in turn, did not apply these legal tests to plaintiffs' race-based claims. Perhaps unsurprisingly then, the district court did not make the requisite fact-findings to satisfy either legal test applicable to plaintiffs' race-based equal protection claims. Therefore, on the record

before us, plaintiffs have failed to satisfy their burden to meet the legal elements required for a showing of unlawful racial gerrymandering or unlawful race-based vote dilution.

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Decision announced May 18, 2022. Opinion filed June 21, 2022. Reversed and injunction order is lifted.

*Brant M. Laue*, solicitor general, argued the cause, and *Kurtis K. Wiard*, assistant solicitor general, *Shannon Grammel*, deputy solicitor general, *Dwight R. Carswell*, deputy solicitor general, *Jeffrey A. Chanay*, chief deputy attorney general, *Derek Schmidt*, attorney general, *Anthony F. Rupp*, of Foulston Siefkin LLP, of Overland Park, and *Gary Ayers* and *Clayton Kaiser*, of the same firm, of Wichita, were with him on the briefs for appellants.

*Stephen R. McCallister*, of Dentons US LLP, of Kansas City, Missouri, argued the cause, and *Mark P. Johnson*, *Betsey L. Lasister*, and *Curtis E. Woods*, pro hac vice, of the same firm, were with him on the briefs for appellees Susan Frick et al.

*Lalitha D. Madduri*, pro hac vice, of Elias Law Group LLP, of Washington, D.C., argued the cause, and *Spencer W. Klein*, pro hac vice, *Joseph N. Posimato*, pro hac vice, of the same firm, *Abha Khanna*, pro hac vice, and *Jonathan P. Hawley*, pro hac vice, of the same firm, of Seattle, Washington, and *Barry R. Grissom* and *Jake Miller*, pro hac vice, of Grissom Miller Law Firm LLC, of Kansas City, Missouri, were with her on the brief for appellees Faith Rivera et al.

*Sharon Brett*, *Josh Pierson*, and *Kayla DeLoach*, of American Civil Liberties Union Foundation of Kansas, of Overland Park, and *Mark P. Gaber*, pro hac vice, *Richard Samuel Horan*, pro hac vice, and *Orion de Nevers*, pro hac vice, of Campaign Legal Center, of Washington, D.C., *Elisabeth S. Theodore*, *R. Stanton Jones*, and *John A. Freedman*, of Arnold & Porter Kaye Scholer LLP, of Washington, D.C., and *Rick Rehorn*, of Tomasic & Rehorn, of Kansas City, were on the briefs for appellees Tom Alonzo et al.

No appearance by Jamie Shew, appellee.

*Edward D. Greim*, *Todd P. Graves*, and *George R. Lewis*, of Graves Garrett LLC, of Kansas City, Missouri, were on the brief for amicus curiae Kansas Legislative Coordinating Council.

*Teresa A. Woody*, of Kansas Appleseed Center for Law and Justice Inc., of Lawrence, was on the brief for amicus curiae Kansas Appleseed Center for Law and Justice Inc.

The opinion of the court was delivered by

STEGALL, J.: In this first-of-its-kind litigation in the state of Kansas, plaintiffs assert unique and novel claims that would bar the Kansas Legislature from enacting congressional district lines such as those at issue in the map colloquially known as "Ad Astra 2." Eager to reshape the legal landscape of redistricting in Kansas, plaintiffs invited the district court to craft new and never before applied legal standards and tests unmoored from either the text of the Kansas Constitution or the precedents of this court. Accepting the invitation, the lower court found the legislative reapportionment in Ad Astra 2 constitutionally deficient as a partisan and racial gerrymander. On review, we find the district court's legal errors fatally undermine its conclusions and, applying the correct legal standards to the facts as found by the lower court, we determine that on the record before us, plaintiffs have not prevailed on any of their claims that Ad Astra 2 violates the Kansas Constitution. Accordingly, we reverse the judgment of the lower court.

FACTUAL AND PROCEDURAL BACKGROUND

The Kansas Legislature is required to redraw Kansas' congressional districts every decade based on population shifts documented in the United States Census. The Legislature fulfilled this duty by passing Substitute for Senate Bill 355 which contained the Ad Astra 2 congressional map. Governor Laura Kelly vetoed the bill, but the Legislature was able to override Governor Kelly's veto, and the bill took effect on February 10, 2022. The new districts gave rise to three lawsuits that were consolidated in

6

Wyandotte County. After a trial, the district court determined that Sub. SB 355 violates the Kansas Constitution. Defendants, who we will refer to as the State, appealed and on May 18 we held that, on the record before us, plaintiffs have not prevailed on their claims that Sub. SB 355 violates the Kansas Constitution. We reversed the judgment and lifted the permanent injunction ordered by the district court. Today, we fully set forth the facts, rationale, and holdings of the court.

Last year, the Kansas Legislature began the process of preparing to redraw Kansas' four congressional districts according to the 2020 Census. Through in-person and virtual meetings, the House and Senate Committees on Redistricting held a listening tour of town hall meetings across the state—14 meetings were held in 14 cities in August 2021, and 4 meetings were held virtually in November 2021.

Also playing a role in the process is the document known as "the Guidelines." The Proposed Guidelines and Criteria for 2022 Congressional and State Legislative Redistricting are a set of principles that set forth "traditional redistricting criteria" substantively the same as those used in the 2012 redistricting cycle. The Guidelines provide calculations for the correct population metrics to determine district size, as well as general priorities for the Legislature to consider. Those priorities include: (1) basing districts on data from the 2020 Census; (2) crafting districts as numerically as equal in population as practical; (3) the plan should have neither the purpose nor effect of diluting minority voting strength; (4) the districts should be as compact and contiguous as possible; (5) the integrity of existing political subdivisions should be preserved when possible; (6) the plan should recognize communities of interest; (7) the plan should avoid contests between incumbents when possible; and (8) the districts should be easily identifiable and understandable by voters.

The Legislature's bipartisan Redistricting Advisory Group adopted the Guidelines and the Senate and House Redistricting Committees received presentations on the Guidelines at initial meetings in January 2022. Only the House Committee on Redistricting adopted the Guidelines—the Senate Committee on Redistricting did not. And more importantly, neither the House nor the Senate as a whole adopted the Guidelines.

Senate Bill 355 was introduced in the Senate on January 20, 2022, and referred to the Committee on Redistricting. The report of the Senate Committee on Redistricting recommended that Sub. SB 355 be adopted. On January 21, several proposed amendments to the plan introduced on the Senate floor were rejected, and that same day the Senate passed Sub. SB 355 on emergency final action by a vote of 26 to 9. The bill was sent to the House on January 24, passed the House Redistricting Committee, and reached the House floor on January 25. After several motions to amend were rejected, the House passed the bill by a vote of 79 to 37.

Sub. SB 355 was then enrolled and presented to Governor Kelly on January 27. Governor Kelly vetoed the bill on February 4. Initially, the motion to override the veto failed, and the veto was sustained. But upon a motion to reconsider, the Senate voted to override the veto 27 to 11, and the House 85 to 37. Sub. SB 355 took effect upon publication in the Kansas Register on February 10, 2022.

Shortly thereafter, plaintiffs sued in state court in Wyandotte County to enjoin the use of Sub. SB 355 in the upcoming elections. The plaintiffs in *Rivera v. Schwab* and *Alonzo v. Schwab* sued Kansas Secretary of State Scott Schwab and Wyandotte County Election Commissioner Michael Abbott, alleging that Sub. SB 355 is a partisan and racial gerrymander and dilutes minority votes in violation of several provisions of the Kansas Constitution. Two weeks later, the plaintiffs in *Frick v. Schwab* sued Schwab and

8

Douglas County Clerk Jamie Shew in Douglas County also alleging that Sub. SB 355 is an unconstitutional partisan gerrymander. We will collectively refer to the plaintiffs in the three actions as plaintiffs.

Plaintiffs' petitions brought several claims under the Kansas Constitution. The Alonzo plaintiffs argued that Ad Astra 2 (1) violates Kansas Constitution Bill of Rights sections 1 and 2 "because it targets [plaintiffs] for differential treatment based upon their political beliefs and past votes"; (2) violates sections 3 and 11 of the Kansas Constitution Bill of Rights because it "discriminates against Kansas Democrats based on their protected political views and past votes, burdens the ability of those voters to effectively associate, and retaliates against Democrats for exercising political speech" by preventing "them from being able to coalesce their votes and elect their preferred candidates who share their political views"; (3) "imposes a severe burden" on plaintiffs' right to vote under Article 5, section 1 by "targeting Democratic voters to prevent them from translating their votes into victories at the ballot box"; and (4) violates equal protection guarantees in sections 1 and 2 of the Kansas Constitution Bill of Rights because it was "created specifically to eliminate the only seat currently held by a minority."

The Rivera plaintiffs similarly claimed violations under the Kansas Constitution citing the right to vote, equal protection, freedom of speech, and freedom of assembly, as well as making claims of racial vote dilution. The Rivera plaintiffs also argued that Ad Astra 2 impermissibly split Kansas' four Native American reservations into two districts.

The Frick plaintiffs allege that the Legislature engaged in partisan gerrymandering by "scooping out" the City of Lawrence from District 2 and adding it to the "Big First." They allege violations of the Kansas Constitution Bill of Rights sections 1, 2, 3, 11, 20, and Article 5, section 1. The Frick plaintiffs, like the Alonzo and Rivera plaintiffs,

9

contend that Ad Astra 2 was developed in secret, rushed through the legislative process, and contradicts established redistricting guidelines.

Plaintiffs recognized that population growth has made it impossible to keep Wyandotte County and Johnson County in a single district but asserted that it was possible and desirable to preserve Wyandotte County in a single district. They argued that under the new plan, the likely electoral outcomes now "are entirely inconsistent with the statewide preferences of Kansas voters," noting that Democrats received 40% of the votes from 2016 to 2020, but asserting that in future elections Democrats will only have a chance to win 25% of the seats at best, with a likelihood that Democrats may receive no seats at all.

They further asserted that while each plaintiff is currently able to "elect a candidate of their choice in Congressional District [CD] 3," under the new plan, CD 3 is now "cracked," separating a portion of minority voters from "crossover white voters." Plaintiffs allege that these minority voters are now "submerged" in the new CD 2 and CD 3 where "white bloc voting will prevent them from electing their preferred candidates." They assert that minority voters—which comprise 29% of the voting age population in CD 3—are only "able to elect their preferred candidate with assistance from a portion of white voters," because "while white voters in Kansas strongly prefer Republican candidates overall, enough white voters in current District 3 cross over to support minority-preferred Democratic candidates to permit those candidates to prevail."

After plaintiffs filed their lawsuits, Schwab and Abbott petitioned our court for mandamus and quo warranto seeking dismissal of the cases. We denied the petition, as mandamus and quo warranto were not available remedies. See *Schwab v. Klapper*, 315 Kan. 150, 154-55, 505 P.3d 345 (2022). We then consolidated the three cases in Wyandotte County. Defendants moved to dismiss the cases, which the district court

denied after a hearing. After an expedited discovery schedule, trial began on April 4, 2022. At the close of plaintiffs' case, defendants moved for judgment, which the district court again denied.

On April 25, 2022, the district court held that Sub. SB 355 violates the Kansas Constitution as both a partisan and a racial gerrymander. Alongside photographs of legislators looking at their phones during their listening tours, the district court first stated that Ad Astra 2 was created in secret and "pushed through the Legislature" on "largely party-line votes" and "with no Democratic support." The court took issue with the fact that the "map-drawers remain a mystery," and the court pointed to testimony from a Senator indicating that it "is not common" for a bill to move so quickly out of committee.

The district court found that a net total of 116,668 people, or 3.9% of Kansas' population, had to be moved to meet population requirements, but noted that Ad Astra 2 moves 394,325 people, or 13.4% of the state population—significantly more than necessary to meet district population requirements.

The court further stated that "the map split known communities of interest, ignored public input, diluted minority votes, and constituted 'textbook gerrymandering.'" The court found that "Ad Astra 2 was designed intentionally and effectively to maximize Republican advantage," relying on expert testimony to conclude that the plan "is an intentional, effective partisan gerrymander." The court, again relying on expert testimony, found that "partisan intent predominated over the Guidelines and traditional redistricting criteria in the drawing of Ad Astra 2 and is responsible for the Republican advantage" in Ad Astra 2. The district court found that plaintiffs' experts' use of statewide elections "to measure the partisanship of simulated and enacted districts is a reliable methodology," and concluded that "Ad Astra 2's districts are less compact than they

11

would be under a map-drawing process that adhered to the Guidelines and prioritized the traditional districting criterion of compactness."

The district court, again crediting expert testimony, found that "Ad Astra 2 was designed to give Republicans a partisan advantage, and that the enacted plan exhibits extreme pro-Republican bias that cannot be explained by Kansas's political geography or by adherence to the Guidelines or traditional redistricting criteria." The court credited expert testimony that asserted splitting Lawrence from Douglas County diluted the votes of Democratic voters in the region and found that the experts' evidence demonstrated "that Ad Astra 2 disregards communities of interest in support of partisan gains."

In addition to its findings regarding partisan factors, the district court also stated that "Ad Astra 2 has high levels of racial dislocation" and concluded that the plan "intentionally and effectively dilutes the voting power of Wyandotte County's minority communities." The court again credited plaintiffs' experts that testified that "racial minorities were moved among districts far more often than white Kansans and that they were divided between districts in a way that contravenes Kansas's racial geography and dilutes minority voting strength." The court further found that the new plan "has the effect of eliminating a performing minority crossover district," resulting in a "particularly pronounced" impact on minority Democratic voters "because the plan treats Democratic minority voters considerably worse than it treats white Democratic and white Republican voters."

The court also credited expert testimony that Ad Astra 2 "negatively impacts the state's Native American community" because the new plan places the Prairie Band Potawatomi reservation into the first district, whereas under the prior plan, all four Native American reservations in Kansas were in the second district. In sum, the court concluded

12

that "Ad Astra 2's dilution of Democratic voting power will obstruct Plaintiffs' ability to elect and support their candidates of choice."

It is critical at this juncture to stop and observe that many of the lower court's fact-findings embed a form of question begging as to what—exactly—is the legal measuring stick doing the work behind the finding. Put another way, many of the district court's found facts are not stated in the form of a pure factual finding. Instead, they assume within them an unstated and unquestioned legal standard. For example, what counts as "treat[ing] Democratic minority voters considerably worse than . . . white Democratic and white Republican voters"? By what standard is the district court measuring an "intentional[] and effective[] dilut[ion]" of the minority vote? As we will explain at greater length below, when a district court mixes questions of law and fact like this, disentangling them may be impossible on review. This is especially true when it is clear—as it is here—that the lower court's findings of fact are permeated with and tainted by erroneous legal conclusions.

In any event, after these mixed conclusions of fact and law, the lower court then held the Kansas Constitution "prohibit[s] partisan gerrymandering" to any degree. The court believed it "neither necessary nor prudent" to "articulat[e] a bright-line standard" for political gerrymandering claims. Rather, it "suffice[d] for the Court's purposes that a standard exists" for the present case. Relying on "opinions of the highest courts in other states"—rather than the text of the Kansas Constitution—the district court created its own test:  (1) "the Legislature acted with the purpose of achieving partisan gain by diluting the votes of disfavored-party members" and (2) the map "will have the desired effect of substantially diluting disfavored-party members' votes." In applying this test, the district court relied on what it discerned as "partisan fairness metrics" and "neutral criteria."

13

Applying this test, the lower court found Ad Astra 2 to be an impermissible "intentional and effective partisan gerrymander" and concluded that Sub. SB 355 could not satisfy strict scrutiny.

The lower court then turned to plaintiffs' race-based claims. Acknowledging that such claims sound in equal protection, the district court held that the Kansas Constitution "affords separate, adequate, and greater" equal protection guarantees "than [does] the federal Constitution." Following this, the district court devised and applied its own five factor test to decide that Ad Astra 2 was an impermissible racial gerrymander that also unconstitutionally diluted minority votes in violation of the Kansas Constitution. It acknowledged that the elements of such a claim—and whether they include a showing of discriminatory intent—is an "issue of first impression." But it declined to decide whether a showing of intent was required because it determined Ad Astra 2 both "*intentionally* and effectively dilutes minority votes." Under the legal tests crafted by the district court, this was sufficient, in its view, to find Ad Astra 2 violates the Kansas Constitution.

The district court permanently enjoined Kansas' election officials "from preparing for or administering any primary or general congressional election under Ad Astra 2." And it further ordered that the "Legislature shall enact a remedial plan in conformity with this opinion as expeditiously as possible." The State immediately appealed to this court.

DISCUSSION

On appeal, the parties spar over several questions: (1) whether the Elections Clause bars state courts from reviewing reapportionment legislation for compliance with state law; (2) what standards this court should use when interpreting and applying the relevant provisions in the Kansas Constitution; (3) whether claims of partisan

14

gerrymandering are justiciable; and (4) whether Ad Astra 2 discriminates against minority voters. We consider each issue below.

But before doing so, we observe that while respecting the dissenters' disagreements with our constitutional reasoning and conclusions, rhetoric describing this outcome as a "stamp of approval" or "complicit" is out of place. Just because a court declines to overrule a legislative enactment does not mean the court has rubber stamped, endorsed, or somehow participated in that enactment. Indeed, "[c]ourts are only concerned with the legislative power to enact statutes, not with the wisdom behind those enactments. When a legislative act is appropriately challenged as not conforming to a constitutional mandate, the function of the court is . . . merely to ascertain and declare whether legislation was enacted in accordance with or in contravention of the constitution—and not to approve or condemn the underlying policy." *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 348-49, 789 P.2d 541 (1990), *abrogated on other grounds by Miller v. Johnson*, 295 Kan. 636, 289 P.3d 1098 (2012), and *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 442 P.3d 509 (2019).

I.   WE HAVE JURISDICTION TO HEAR PLAINTIFFS' CLAIMS

The Attorney General claims the Elections Clause of the United States Constitution bars any state court from considering the validity of legislatively enacted congressional district maps. The Elections Clause provides:

> "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4.

15

The State frames its argument as a complete jurisdictional bar, arguing broadly that "when the state legislature missteps, the authority to correct it lies with Congress." We are unpersuaded. The United States Supreme Court has never embraced this view of the Elections Clause. In 1932, the Supreme Court examined whether the Elections Clause "invest[ed] the legislature with a particular authority" which would "render[] inapplicable the conditions which attach to the making of state laws." *Smiley v. Holm*, 285 U.S. 355, 365, 52 S. Ct. 397, 76 L. Ed. 795 (1932). The Court concluded that "the exercise of the authority must be in accordance with the method which the State has prescribed for legislative enactments," finding "no suggestion in the [Elections Clause] of an attempt to endow the legislature of the State with power to enact laws in any manner other than that in which the constitution of the State has provided that laws shall be enacted." 285 U.S. at 367-68.

And in recent years, the Supreme Court has continued to reject similar arguments. See *Rucho v. Common Cause*, 588 U.S. ___, 139 S. Ct. 2484, 2495-96, 204 L. Ed. 2d 931 (2019) (rejecting the argument that "through the Elections Clause, the Framers set aside electoral issues such as the one before us as questions that only Congress can resolve"); *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787, 817-18, 135 S. Ct. 2652, 192 L. Ed. 2d 704 (2015) ("Nothing in [the Elections] Clause instructs, nor has this Court ever held, that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution."). In fact, the Supreme Court's recent decision in *Rucho* expressly contemplates state court review of congressional reapportionment schemes for compliance with state law. 139 S. Ct. at 2507 (in a congressional redistricting challenge, the Court declined to find that partisan gerrymandering violated the U.S. Constitution, but noted that "state statutes and state constitutions can provide standards and guidance for state courts to apply").

The Attorney General points us to a few recent statements of skepticism from individual Supreme Court justices toward this body of law. In 2021, the Supreme Court denied a petition for certiorari in *Republican Party of Pennsylvania v. Degraffenreid*, 592 U.S. ___, 141 S. Ct. 732, 209 L. Ed. 2d 164 (2021). The decision resulted in two dissenting opinions. Justice Thomas expressed that "petitioners presented a strong argument that the Pennsylvania Supreme Court's decision violated the Constitution by overriding 'the clearly expressed intent of the legislature'" because "the Federal Constitution, not state constitutions, gives state legislatures authority to regulate federal elections." 141 S. Ct. at 733 (Thomas, J., dissenting). Justice Alito, joined by Justice Gorsuch, pointed out that the Elections Clause—which confers on state legislatures the authority to make rules governing federal elections—"would be meaningless if a state court could override the rules adopted by the legislature simply by claiming that a state constitutional provision gave the courts the authority to make whatever rules it thought appropriate for the conduct of a fair election." 141 S. Ct. at 738 (Alito, J., dissenting). The following year, Justice Alito again dissented from the denial of an application for stay, joined by Justices Thomas and Gorsuch. *Moore v. Harper*, 595 U.S. ____, 142 S. Ct. 1089, 212 L. Ed. 2d 247 (2022) (Alito, J., dissenting). He expressed similar concern with the growing issue over the proper interpretation of the Elections Clause. Justice Kavanaugh agreed with Justice Alito's position that the Court should review the Elections Clause issue. 142 S. Ct. 1089 (Kavanaugh, J., concurring).

But these statements are not controlling law—the justices making them do not even purport to make this claim. And we cannot accept the Attorney General's invitation to ground our rulings on speculation concerning the future direction of Supreme Court jurisprudence. Instead, we are bound to follow United States Supreme Court precedent on questions of federal law. See *Arizona v. Evans*, 514 U.S. 1, 8-9, 115 S. Ct. 1185, 131 L. Ed. 2d 34 (1995) ("[S]tate courts . . . are *not* free from the final authority of" the Supreme Court when interpreting the U.S. Constitution); *State v. Tatro*, 310 Kan. 263, 272, 445

17

P.3d 173 (2019) ("[T]his court must follow the United States Supreme Court's interpretation of the United States Constitution."). We therefore conclude that we are not jurisdictionally barred from reviewing reapportionment legislation for compliance with the Kansas Constitution.

II.  THE GOVERNING LAW

    1.  *Anti-gerrymandering claims sound in equal protection*

The gravamen of plaintiffs' claims sound in equal protection. While the other provisions of the Kansas Constitution relied upon by the plaintiffs and the district court— Kan. Const. Bill of Rights, §§ 1, 3, 11, 20; art. 5, § 1—protect vital rights, they do not provide an independent basis for challenging the drawing of district lines.

Equal protection is at the heart of both partisan and racial gerrymandering or vote dilution claims. See *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 413-14, 126 S. Ct. 2594, 165 L. Ed. 2d 609 (2006) (*LULAC*) (federal equal protection challenge to congressional redistricting map as unconstitutional partisan gerrymander); *Gill v. Whitford*, 585 U.S. ___, 138 S. Ct. 1916, 1925-26, 201 L. Ed. 2d 313 (2018) (same, despite allegations of violations of federal rights to free speech); *Rucho*, 139 S. Ct. at 2491 (same, despite allegations of violations of the Elections Clause, First Amendment, and Article I); *Shaw v. Reno*, 509 U.S. 630, 642, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993) (federal equal protection challenge to congressional redistricting map as unconstitutional racial gerrymander); *Miller v. Johnson*, 515 U.S. 900, 903-04, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995) (same).

Throughout this litigation, plaintiffs and the district court have attempted to decorate and enhance their claims with various citations to rights found in other provisions in the Kansas Constitution, including the right to vote, and rights to free speech and association. Kan. Const. Bill of Rights, §§ 1, 3, 11, 20; art. 5, § 1. Plaintiffs and the district court also recite "procedural defects" in the process of drafting Sub. SB 355—including allegations that the listening tour was simply a box-checking exercise; Ad Astra 2 was adopted with unseemly rapidity; Ad Astra 2 was created in secret by Republicans; and the Legislature ignored the Guidelines. These procedural claims echo the concerns raised in *In re Validity of Substitute Senate Bill 563*, 315 Kan. ___ (2022) (No. 125,083 this day decided). As we determined there, however, such complaints do not rise to the level of constitutional objections. Therefore, the basis of each of plaintiffs' claims remains foundationally grounded in equal protection guarantees.

The district court began with a discussion of plaintiffs' equal protection claims under sections 1 and 2 of the Kansas Constitution Bill of Rights, stating that "partisan gerrymandering deprives voters of '*equal power* and influence in the making of laws which govern'" them and asserting that the "goal of partisan gerrymandering is to eliminate the people's authority over government by giving different voters vastly *unequal political* power." (Emphases added.) The court then turned to the right to vote under Article 5, section 1, framing it in equal protection terms. It explicitly styled its analysis under equal protection, stating that "the right to vote is secured by *Sections 1 and 2* of the Kansas Bill of Rights and by Article 5, Section 1 . . . ." (Emphasis added.) The court relied on sections 1 and 2 of the Kansas Constitution Bill of Rights in defining the right to vote as the right to have "'equal legislative representation.'"

Similarly, the lower court conflated the rights to free speech and assembly with the right to equal protection. First the district court claimed that partisan gerrymandering singles out a "specific class" of voters for "disfavored treatment." Then, the district court

19

held that "[w]hen the state engages in gerrymandering to negate that party's power, it has the effect of 'debilitat[ing]' the *disfavored party* and 'weaken[ing] its ability to carry out its core functions and purposes.'" (Emphasis added.) This analysis is again steeped in equal protection principles.

At bottom, plaintiffs assert a variety of constitutional rights but the sole mechanism relied on for judicial enforcement of those rights is the constitutional guarantee of equal protection—a fact the district court effectively understood. *Any line drawing*, even one that violates equal protection guarantees, does not infringe on a stand-alone right to vote, the right to free speech, or the right to peaceful assembly. See *Rucho*, 139 S. Ct. at 2504 ("[T]here are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue. The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district."); see also *Harper v. Hall*, 380 N.C. 317, 448, 868 S.E.2d 499 (2022) (Newby, C.J., dissenting) ("The fundamental right to vote on equal terms simply means that each vote should have the same weight. . . . [P]artisan gerrymandering has no significant impact upon the right to vote on equal terms under the one-person, one-vote standard. . . . Partisan gerrymandering plainly does not place any restriction upon the espousal of a particular viewpoint."), *petition for cert. docketed* March 21, 2022.

2. *Section 2 of the Kansas Constitution Bill of Rights is the textual grounding and location of our Constitution's guarantee of equal protection to all citizens*

Traditionally we have held that under the Kansas Constitution Bill of Rights, sections 1 and 2 offer the same guarantees of due process and equal protection as provided in the Fourteenth Amendment of the United States Constitution. *Farley v. Engelken,* 241 Kan. 663, 667, 740 P.2d 1058 (1987) (Sections 1 and 2 of the Kansas Constitution Bill of Rights "are given much the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law.").

At times our court has attempted to distinguish between the two sections as providing equal protection for "individual rights" (Section 1) and "political rights" (Section 2). See *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005) ("Section 1 applies in cases . . . when an equal protection challenge involves individual rights."); *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, Syl. ¶ 3, 3 P. 284 (1884) ("Section 2 is devoted to matters of a political nature.").

We have recently clarified that Kansas' section 1 has no textual counterpart in the U.S. Constitution and therefore has its own independent meaning and effect. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 624, 440 P.3d 461 (2019) ("[T]his side-by-side comparison reveals, section 1 contains the following words not found in the Fourteenth Amendment:  'All men are possessed of equal and inalienable natural rights.' In fact, no provision of the United States Constitution uses the term 'natural rights' . . . . "); 309 Kan. at 688 (Biles, J., concurring) ("As both the majority and dissent point out, section 1 of the Kansas Constitution Bill of Rights differs from any federal counterpart . . . ."); 309 Kan. at 763 (Stegall, J., dissenting) (Recognizing section 1 provides unique protections different from the federal Constitution:  "[o]f course, the language of the Declaration does not carry 'the force of organic law' in the federal Constitution as it does in Kansas.").

After our decision in *Hodes* (giving a substantive rights effect to section 1), it is clear that the textual grounding of equal protection guarantees contained in the Kansas Constitution Bill of Rights is firmly rooted in the language of section 2, which states:

> "All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency." Kan. Const. Bill of Rights, § 2.

21

Even though *Hodes* changed the way in which we interpret section 1, it has not changed our historical and fundamental interpretation of the scope of equal protection found in section 2. That is to say, section 2 is "given much the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law." See *Farley*, 241 Kan. at 667; *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981); *State v. Wilson*, 101 Kan. 789, 795-96, 168 P. 679 (1917). Put even more clearly, the equal protection guarantees found in section 2 are coextensive with the equal protection guarantees afforded under the Fourteenth Amendment to the United States Constitution. Compare U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."); with Kan. Const. Bill of Rights § 2 ("[A]ll free governments are . . . instituted for [the people's] equal protection and benefit."). Therefore, Kansas courts shall be guided by United States Supreme Court precedent interpreting and applying the equal protection guarantees of the Fourteenth Amendment of the federal Constitution when we are called upon to interpret and apply the coextensive equal protection guarantees of section 2 of the Kansas Constitution Bill of Rights.

III.  PLAINTIFFS' PARTISAN GERRYMANDERING CLAIMS

1.  *The political question doctrine*

In addressing plaintiffs' claim that Ad Astra 2 is an impermissible partisan gerrymander, we are confronted first with what has come to be known as the "political question doctrine." This legal rule guiding judicial decision-making is nearly as old as the Republic, going all the way "back to the great case of *Marbury v. Madison*." § 15 "Case or Controversy"—Political Questions, 20 Fed. Prac. & Proc. Deskbook § 15 (2d ed.).

There, Chief Justice John Marshall "expressed the view that the courts will not entertain political questions even though the questions involve actual controversies." § 15 "Case or Controversy"—Political Questions, 20 Fed. Prac. & Proc. Deskbook § 15. The Court in *Marbury* held that the executive branch (and by extension, the legislative branch) is vested "with certain important political powers" and those branches are accountable only to their "country"—that is the voters—and to their "own conscience" because the "subjects are political." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66, 2 L. Ed. 60 (1803).

As the political question doctrine developed, it became clear that in certain circumstances a respect for the coequal and coordinate executive and legislative branches of government demanded that the judicial branch admit itself not competent to rule on matters purely political. That is, the "political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations" that are inextricable from the exercise of political discretion vested in the political branches of government. 16 C.J.S. Constitutional Law § 392.

Judges called on to determine when the political question doctrine is implicated must ask themselves—among other things—whether the controversy is capable of resolution within the competency of the judicial branch. That is, do the traditional tools of judging—such as clear, neutral, and "judicially discoverable and manageable standards"—exist as a compass against which to measure the true north of any controversy? *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Or, would judges be left to simply substitute their own "initial policy determination" for that of the other branches? 369 U.S. at 217.

If resolving a controversy is outside the scope of the competence of the judiciary, it is said to be "nonjusticiable"—that is, it is a matter committed by the structure of our Constitution to the legislative or executive branches of government. And these branches are ultimately accountable both to the voters and their own conscience. And while common sense and history may not be able to speak to the effect of conscience on political decision-makers, democratic accountability wielded by voters is woven into the very fabric of our government and will—undoubtedly—have its say in the matter.

This outcome is not an unfortunate accident or a mistake in our constitutional structure, but rather "a consequence of the separation of powers among the legislative, executive, and judicial branches." *Gannon v. State*, 298 Kan. 1107, 1119, 1136-37, 319 P.3d 1196 (2014). And this very separation of powers is one of the surest timbers guaranteeing that the house of liberty stands firm and lasts across the centuries amid the swirling winds of any particular political issue *du jour*.

### 2. *Partisanship in district line drawing is permissible*

Plaintiffs do suggest the application of a clear standard to this dispute. They simply claim that partisan gerrymandering is verboten under Kansas law. That is, they claim that any consideration by the Legislature of partisan factors in deciding where to draw district lines is offensive to constitutional principles. They ask Kansas courts to adopt a bright line standard of zero tolerance and mandate that only politically neutral factors be used by the Legislature. And the district court agreed, holding that the Kansas Constitution "prohibit[s] partisan gerrymandering."

The dissent takes issue with this characterization. While ultimately, how we characterize plaintiffs' political gerrymandering claims does not impact our analysis, it is helpful to understand exactly why such a bright line rule is attractive. In fact, at oral

argument, counsel for the Frick plaintiffs defined "political gerrymandering" as *any* line drawing "with party in mind." In response to the question, "How is partisan gerrymandering a legitimate government function?" counsel for plaintiffs responded, "I don't think it is legitimate. . . .To say that it's gone on for a long time and it seems inevitable doesn't mean it's legitimate at all. . . . I don't think that partisan gerrymandering has a legitimate interest."

If this was the law in Kansas, resolving claims of partisan gerrymandering would indeed be justiciable. A bright line prohibition is certainly a judicially manageable standard. But this has never been the law in Kansas, and in reaching its conclusion the district court completely ignored our large body of caselaw on this subject. For we have regularly and repeatedly held that the Legislature is constitutionally permitted to consider partisanship when drawing district lines. And this rule is consistent with longstanding United States Supreme Court precedent.

Over four decades ago we wrote: "'Politics and political considerations are inseparable from districting and apportionment.'" *In re House Bill No. 2620*, 225 Kan. 827, 840, 595 P.2d 334 (1979) (quoting *Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S. Ct. 2321, 37 L. Ed. 2d 298 [1973]). We have repeatedly recognized the reality that the "'political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. . . . [I]t requires no special genius to recognize the political consequences of drawing a district line along one street rather than another.'" *In re House Bill No. 2620*, 225 Kan. at 840 (quoting *Gaffney*, 412 U.S. at 753). Considering these hard political truths inherent in the redistricting process, we reached the inescapable conclusion that the "'reality is that districting inevitably *has and is intended to have* substantial political consequences.'" (Emphasis added.) *In re House Bill No. 2620*, 225 Kan. at 840 (quoting *Gaffney*, 412 U.S. at 753). The district court cannot write these hard truths out of existence with the fiat power of its judicial pen. Our

precedent (and prudent judgment) counsels a more modest approach to questions that touch the core constitutional principle of separation of powers and the ongoing dictate that the coordinate departments of government accord one another the due and proper respect expected and owed under our unique constitutional arrangements.

Given this, if the redistricting process is intended to have "substantial political consequences" it is no surprise that our court has consistently rejected pleas to establish a bright line prohibition on politics in the redistricting process. *In re 2002 Substitute for Senate Bill 256*, 273 Kan. 731, 734, 45 P.3d 855 (2002). For example, we have described the legislative goal of "safely retaining seats for the political parties" as a "legitimate political goal." *2002 Substitute for House Bill 2625*, 273 Kan. 715, 722, 44 P.3d 1266 (2002). In 1989, we rejected the claim that legislatively drawn lines were unlawful because "political considerations prevailed over stated apportionment guidelines" on the grounds that "any plan would . . . have adverse consequences for incumbents who are pitted against each other." *In re Substitute for House Bill No. 2492*, 245 Kan. 118, 128, 775 P.2d 663 (1989). In yet another redistricting case, we plainly held that objections to legislative line drawing on the mere assertion that "there was partisan political gerrymandering in redistricting" could never "reveal a fatal constitutional flaw" without more. *In re Senate Bill No. 220*, 225 Kan. 628, 637, 593 P.2d 1 (1979).

The United States Supreme Court, too, has never suggested partisanship is unlawful if it touches the legislative redistricting process. In fact, the opposite. In *Vieth v. Jubelirer* the Court wrote the United States Constitution "clearly contemplates districting by political entities" and the process "unsurprisingly . . . turns out to be root-and-branch a matter of politics." 541 U.S. 267, 285-86, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004). As such, "*partisan districting is a lawful and common practice* [which] means that there is almost *always* room for an election-impeding lawsuit contending that

26

partisan advantage was the predominant motivation." (Emphasis added.) 541 U.S. at 285-86. The operative principle is clear.

And while the plurality holding of *Vieth* (that partisan gerrymandering claims are nonjusticiable) did not gain majority support on the Court until 2019 in *Rucho*, there has long been widespread agreement among justices across the spectrum that partisan factors are *legitimate considerations in the districting process*. For example, in dissent in *Vieth*, Justice Stephen Breyer wrote that using "purely political boundary-drawing factors" can "find justification in . . . desirable democratic ends" even though it may be "harmful to the members of one party." 541 U.S. at 360 (Breyer, J., dissenting).

This principle is commonplace in the United States Supreme Court's redistricting jurisprudence. "We have never denied that apportionment is a political process, or that state legislatures could pursue legitimate secondary objectives as long as those objectives were consistent with a good-faith effort to achieve population equality at the same time." *Karcher v. Daggett*, 462 U.S. 725, 739, 103 S. Ct. 2653, 77 L. Ed. 2d 133 (1983). In a decision written by Justice Elena Kagan the Court described "partisan advantage" as a legitimate consideration in district line drawing on an equal footing with other traditional considerations such as "compactness" and "respect for political subdivisions." *Cooper v. Harris*, 581 U.S. ____, 137 S. Ct. 1455, 1464, 197 L. Ed. 2d 837 (2017); see also *Easley v. Cromartie*, 532 U.S. 234, 239, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001) (recognizing that "the creation of a safe Democratic seat" was a "constitutional political objective"); *Gaffney*, 412 U.S. at 753-54 (legislatures may validly "work with . . . political . . . data" and may "seek . . . to achieve the political or other ends of the State, its constituents, and its officeholders").

We need not belabor the point.

*3. Claims of excessive partisan gerrymandering are nonjusticiable in Kansas*

Given that the Legislature may appropriately and lawfully consider partisan factors in redistricting, at the heart of a claim of partisan gerrymandering is not merely that partisan factors were used, but rather that they were used "too much." The lower court at one point appears to acknowledge this by quoting our prior caselaw declining to find excessive partisan gerrymandering in any previous case. The district court plausibly drew the lesson from these decisions that we had reached the "merits" of older partisan gerrymandering claims. But this overreads those decisions. In fact, our predecessors never actually had to ask the crucial question—how much is too much? And are there any manageable and neutral judicial standards by which judges can decide that question without resort to our own partisan biases?

These are not new questions for courts and judges. In *LULAC*, the Court put the matter succinctly when it described the plaintiff's insurmountable problem in trying to articulate "a standard for deciding *how much partisan dominance is too much*." (Emphasis added.) 548 U.S. at 420. This is precisely the problem today's plaintiffs cannot overcome. This is because a "permissible intent—securing partisan advantage—does not become constitutionally impermissible . . . when that permissible intent 'predominates.'" *Rucho*, 139 S. Ct. at 2502-03.

Essentially, the *Rucho* Court struggled to know whether there can ever be "too much" of a legitimate legislative purpose in the process of state law-making. Its answer, in sum, was—*maybe*, but without codified law to guide judges in knowing when too much partisanship becomes so unfair as to offend constitutional principles, the question cannot be answered. In the parlance of justiciability, the question presents no "'clear, manageable and politically neutral'" judicial standard. 139 S. Ct. at 2500.

28

The Court explained further that:

"[I]t is not even clear what fairness looks like in this context. There is a large measure of 'unfairness' in any winner-take-all system. Fairness may mean a greater number of competitive districts. Such a claim seeks to undo packing and cracking so that supporters of the disadvantaged party have a better shot at electing their preferred candidates. But making as many districts as possible more competitive could be a recipe for disaster for the disadvantaged party. As Justice White has pointed out, '[i]f all or most of the districts are competitive . . . even a narrow statewide preference for either party would produce an overwhelming majority for the winning party in the state legislature.'

"On the other hand, perhaps the ultimate objective of a 'fairer' share of seats in the congressional delegation is most readily achieved by yielding to the gravitational pull of proportionality and engaging in cracking and packing, to ensure each party its 'appropriate' share of 'safe' seats. Such an approach, however, comes at the expense of competitive districts and of individuals in districts allocated to the opposing party.

"Or perhaps fairness should be measured by adherence to 'traditional' districting criteria, such as maintaining political subdivisions, keeping communities of interest together, and protecting incumbents. But protecting incumbents, for example, enshrines a particular partisan distribution. And the 'natural political geography' of a State—such as the fact that urban electoral districts are often dominated by one political party—can itself lead to inherently packed districts. As Justice Kennedy has explained, traditional criteria such as compactness and contiguity 'cannot promise political neutrality when used as the basis for relief. Instead, it seems, a decision under these standards would unavoidably have significant political effect, whether intended or not.'

"Deciding among just these different visions of fairness (you can imagine many others) poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral. Any judicial decision on what is 'fair' in this context would be an 'unmoored determination' of the sort

29

characteristic of a political question beyond the competence of the federal courts. [Citations omitted.]" 139 S. Ct. at 2500.

We find the reasoning of *Rucho* persuasive and expressly adopt it here. But that does not end the inquiry at the state level.

*Rucho* declared that it "is vital in such circumstances that the Court act only in accord with especially clear standards . . . [because] '[w]ith uncertain limits, intervening courts—even when proceeding with best intentions—would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust.'" 139 S. Ct. at 2498. And while *Rucho* could discern no such "especially clear standards" in federal law, the Court left open the possibility that such standards might exist under state law. As such, *Rucho* held that while claims of political gerrymandering were nonjusticiable political questions at the federal level, such claims may be justiciable at the state level.

We agree with the Court's characterization of its holding—that it "does not condone excessive partisan gerrymandering. Nor does our conclusion condemn complaints about districting to echo into a void." 139 S. Ct. at 2507. This is because states are free to adopt clear standards expressly setting limits on partisan gerrymandering. Such clear standards can, the Court readily acknowledged, provide courts with the necessary tools to adjudicate claims of excessive partisan gerrymandering. The *Rucho* court pointed to Florida as a good example:  "In 2015, the Supreme Court of Florida struck down that State's congressional districting plan as a violation of the Fair Districts Amendment to the Florida Constitution." 139 S. Ct. at 2507. The Court then noted that "[t]he dissent wonders why we can't do the same. The answer is that there is no 'Fair Districts Amendment' to the Federal Constitution. *Provisions in state statutes and state constitutions can provide standards and guidance for state courts to apply*." (Emphasis added.) 139 S. Ct. at 2507.

30

And that brings us squarely to the question we must now answer: Are claims of excessive partisan gerrymandering justiciable under the Kansas Constitution? Whether a claim is nonjusticiable because it may be a political question is a question of law over which we exercise unlimited review. *Gannon*, 298 Kan. at 1118, 1136.

We described Kansas' political question doctrine in *Gannon*, 298 Kan. at 1119, 1136-37. *Gannon* explained that Article II, Section 2 of the United States Constitution limits the judicial power to "Cases" or "Controversies."

> "But because Article 3 of the Kansas Constitution does not include any 'case' or 'controversy' language, our case-or-controversy requirement stems from the separation of powers doctrine embodied in the Kansas constitutional framework. That doctrine recognizes that of the three departments or branches of government, '[g]enerally speaking, the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws, and the judicial power is the power to interpret and apply the laws *in actual controversies*.' (Emphasis added.) And Kansas, not federal, law determines the existence of a case or controversy, *i.e.*, justiciability. But this court is not prohibited from considering federal law when analyzing justiciability.

> "Under the Kansas case-or-controversy requirement, courts require that (a) parties have standing; (b) issues not be moot; (c) issues be ripe, having taken fixed and final shape rather than remaining nebulous and contingent; and (d) *issues not present a political question.* . . .

>       . . . .

> "The United States Supreme Court has held: 'The nonjusticiability of a political question is primarily a function of the separation of powers.' In other words, it is an acknowledgment of 'the relationship between the judiciary and the other branches or departments of government.' . . .

"As a result, '[t]he governments, both state and federal, are divided into three departments, each of which is given the powers and functions appropriate to it. Thus a dangerous concentration of power is avoided, and also the respective powers are assigned to the department best fitted to exercise them.' As a consequence of the separation of powers among the legislative, executive, and judicial branches, '[q]uestions in their nature political . . . can never be made in this court.' [Citations omitted.]" (Emphasis added.) 298 Kan. at 1119, 1137.

To determine if a political question exists, we look for the presence of one or more of the six characteristics established by the United States Supreme Court in *Baker*, 369 U.S. at 217. We will dismiss a case as nonjusticiable because it is a political question only if at least one of these characteristics "is inextricable from the case" before us. 369 U.S. at 217. Here we are concerned exclusively with the *Rucho* question—is there a judicially discoverable and manageable standard in Kansas law that will guide a court in resolving any claim of excessive partisan gerrymandering? And unlike in Florida and other of our sister states that have codified limits on partisan gerrymandering, in Kansas the answer (for now) must be no.

As explained above, the lower court here adopted the most extreme version of plaintiffs' arguments—that any consideration of partisanship in district line drawing is constitutionally prohibited—and in so doing avoided the justiciability problem. That legal starting point is, however, demonstrably wrong.

Given this, the plaintiffs here have also proposed a variety of different metrics for measuring "fairness" and answering the "how much is too much" question. But none of these metrics have a foundation in Kansas law—either statutory enactment or constitutional text. Plaintiffs denounce the Legislature's drawing of Ad Astra 2, criticizing it as an "abomination"; as giving an "unfair and unearned advantage" to Republicans; as being "devastating" for Lawrence Democrats; and because it

32

"disincentivizes Democratic voter mobilization, voter registration, voter turnout, [and] fundraising," among other things. But as one author has put it, "[s]uch criticism assumes too much. One cannot consider gerrymandering the antithesis of fair representation unless one adopts some definition of fair representation in the first place." Moore, *A "Frightful Political Dragon" Indeed: Why Constitutional Challenges Cannot Subdue the Gerrymander*, 13 Harv. J.L. & Pub. Pol'y 949, 971 (1990). "Just as no configuration of boundary lines can claim to be natural or inherently just, so too no seat-to-vote ratio can claim to be natural or inherently just." 13 Harv. J.L. & Pub. Pol'y at 973.

In other words, before we can even begin evaluating whether an alleged partisan gerrymander is unconstitutional, we would first need to determine what our baseline definition of "fairness" is. And as the *Rucho* Court explained, deciding among different proposed metrics of fairness poses questions that are political, not legal. Any decisions made about redistricting—even if made by a neutral, independent court—would inherently involve making an initial policy determination. See *Gaffney*, 412 U.S. at 753-54 (noting that the Court has not "attempted the impossible task of extirpating politics from what are the essentially political processes of the sovereign States").

Several other states have solved this problem by codifying such clear standards in their laws. Some states have mandated at least some of the traditional districting criteria for their mapmakers, and others have outright prohibited partisan favoritism in redistricting. See, e.g., Ohio Const. art. 11, § 6 (directing the Ohio redistricting commission to draw compact districts in a way that "correspond[s] closely to the statewide preferences of the voters of Ohio" and avoid drawing plans "primarily to favor or disfavor a political party"); Md. Const. art. III, § 4 (directing the Legislature to give "[d]ue regard" to "boundaries of political subdivisions" when drawing districts); Mich. Const. art. 4, § 6 (establishing an independent redistricting commission and requiring the commission to abide by specific procedural steps as well as a set of substantive criteria,

33

including that the districts be "geographically contiguous"; "reflect the state's diverse population and communities of interest"; "reflect consideration of county, city, and township boundaries"; "be reasonably compact"; "not provide a disproportionate advantage to any political party"; and not "favor or disfavor an incumbent"); Mo. Const. art. III, § 3 ("Districts shall be [designed] in a manner that achieves both partisan fairness and, secondarily, competitiveness . . . . 'Partisan fairness' means that parties shall be able to translate their popular support into legislative representation with approximately equal efficiency."); Iowa Code § 42.4(5) (2016) ("No district shall be drawn for the purpose of favoring a political party, incumbent legislator or member of Congress, or other person or group."); N.Y. Const. art. III, § 4 ("Districts shall not be drawn to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties. The commission shall consider the maintenance of cores of existing districts, of pre-existing political subdivisions, including counties, cities, and towns, and of communities of interest."); Colo. Const. art. V, § 44 ("The practice of political gerrymandering, whereby congressional districts are purposefully drawn to favor one political party or incumbent politician over another, must end.").

Kansas is substantially different from states having codified a constitutional duty to prohibit partisan gerrymandering. And we likewise differ from still other states that—lacking a clear constitutional mandate—have nevertheless discerned clear standards in their case precedent. See *Harper v. Hall*, 380 N.C. 317, 364, 385, 389, 868 S.E.2d 499 (2022) (discussing history of reapportionment litigation in North Carolina, noting N.C. Const. art. II, §§ 3, 5 incorporates "traditional neutral" principles of reapportionment but "does not include 'partisan advantage'" and the state's past gerrymandering cases provide "ample guidance as to possible bright-line standards that could be used to distinguish presumptively constitutional redistricting plans from partisan gerrymanders"); *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) (recognizing vote dilution theory in reapportionment dispute).

Unlike these states, Kansas has not adopted such standards. For this reason, we cannot follow the decisions of other state supreme courts—such as the North Carolina Supreme Court in *Harper*, a decision relied on heavily by plaintiffs and the lower court—that have found their states to be within the *Rucho* exception of states with "statutes and . . . constitutions" that "provide standards and guidance for state courts to apply." *Rucho*, 139 S. Ct. at 2507. In the absence of statutory or constitutional standards in Kansas—or even standards in our case precedent—plaintiffs point to the substantive content of the Guidelines and ask us to find standards of "fairness" there. But as already mentioned, the Legislature has never adopted the Guidelines. They certainly are not found in our Constitution. As such, the Guidelines are not "actual rules"—which is to say they are not law. *Apodaca v. Willmore*, 306 Kan. 103, 136, 392 P.3d 529 (2017) (Stegall, J., dissenting) (describing the legal difference between guidelines and rules).

During one Senator's testimony at trial, he struggled to articulate how much authority the Guidelines carried—he described them as "sort of a promise to the people." At most, the Guidelines represent a "promise" made only by the House Committee on Redistricting (the only formal committee of legislators to actually adopt them). And in any event, internal operating procedures of the Legislature—and the Guidelines cannot even go so far as to claim this status—are not binding authority that can give rise to a legal challenge that courts can adjudicate. See *Nixon v. United States*, 506 U.S. 224, 236, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993) (declining to "open[] the door of judicial review to the procedures used by the Senate").

Considering all of this, we conclude that until such a time as the Legislature or the people of Kansas choose to follow other states down the road of limiting partisanship in the legislative process of drawing district lines, neither the Kansas Constitution, state statutes, nor our existing body of caselaw supply judicially discoverable and manageable

35

standards "for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral." *Rucho*, 139 S. Ct. at 2500. We hold that the question presented is nonjusticiable as a political question, at least until such a time as the Legislature or the people of Kansas choose to codify such a standard into law.

IV. PLAINTIFFS' RACE-BASED CLAIMS

1. *The district court applied the wrong legal standards to evaluate plaintiffs' racial discrimination claims*

In addition to claims of partisan gerrymandering, plaintiffs also alleged that the Legislature engaged in unconstitutional race-based discrimination when it enacted Ad Astra 2. Such claims brought under federal law arise under the Fourteenth Amendment's equal protection guarantees. See, e.g., *Cooper*, 137 S. Ct. at 1463 ("The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans."); *Miller*, 515 U.S. at 904 (the "central mandate" of the Equal Protection Clause of the Fourteenth Amendment is "racial neutrality in governmental decisionmaking"); *Shaw*, 509 U.S. at 641 (recognizing that minority vote dilution "schemes violate the Fourteenth Amendment when they are adopted with a discriminatory purpose and have the effect of diluting minority voting strength").

As we have already explained, we will adhere to equal protection precedent from the United States Supreme Court when applying the coextensive equal protection guarantees found in section 2 of the Kansas Constitution Bill of Rights. The district court, however, concluded that the federal equal protection standards were inapplicable because "Kansas's guarantee of equal benefit 'affords separate, adequate, and greater rights than the federal Constitution.'" In doing so, the district court erred because, as explained above, the equal protection guarantees contained in section 2 are coextensive with the same equal protection guarantees enshrined in the Fourteenth Amendment. The lower

36

court then compounded this legal error by crafting its own set of "five non-exclusive factors"—unmoored from precedent—for examining racial gerrymandering and minority voter dilution claims:

> "(1) whether the redistricting plan has a more negative effect on minority voters than white voters, (2) whether there were departures from the normal legislative process, (3) the events leading up to the enactment, including whether aspects of the legislative process impacted minority voters' participation, (4) whether the plan substantively departed from prior plans as it relates to minority voters, and (5) any historical evidence of discrimination that bears on the determination of intent."

In support of this newly articulated test, the district court provided just one citation to *Jones v. Kansas State University*, 279 Kan. 128, 145, 106 P.3d 10 (2005). But *Jones* has no connection to redistricting, tests for racial discrimination, discriminatory intent, or the like. The page in *Jones* the district court cited to is merely a recitation of our familiar "fundamental rule" governing statutory interpretation "that the intent of the legislature governs if that intent can be ascertained." The district court erred in departing from the well-established and robust legal standards that abound in United States Supreme Court caselaw governing race-based claims made in redistricting challenges.

> 2. *Section 2 protects against two distinct types of race-based decision-making by the Legislature in drawing district lines*

Government decision-making on the basis of race is antithetical to the principles of equal protection enshrined in both the Fourteenth Amendment and in section 2 of the Kansas Constitution Bill of Rights. The equal protection guarantees found in section 2, like the Fourteenth Amendment, protect against two distinct kinds of racial discrimination in the drawing of district lines. First, section 2 protects against racial gerrymandering which occurs when a legislative body uses race as the predominant factor in choosing where to draw the lines. Second, section 2 protects against targeted minority

37

voter dilution which occurs when a legislative body invidiously discriminates against a minority population to minimize or cancel out the potential power of the minority group's collective vote. The United States Supreme Court has set forth explicit legal tests to be applied to each of these distinct claims, and we expressly adopt those same tests to apply when those challenges are made under section 2 of the Kansas Constitution Bill of Rights.

First, a plaintiff bringing a racial gerrymandering claim must demonstrate at the outset "that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Cooper*, 137 S. Ct. at 1463. Determining which redistricting factor predominates presents a "most delicate task" for courts, *Miller*, 515 U.S. at 905, because "crucially, political and racial reasons are capable of yielding similar oddities in a district's boundaries. That is because, of course, 'racial identification is highly correlated with political affiliation.'" *Cooper*, 137 S. Ct. at 1473. As the Supreme Court has expressly recognized:

> "The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916.

A plaintiff can cross this threshold by showing that the Legislature subordinated lawful, race-neutral districting factors—such as compactness, respect for political subdivisions, and partisan advantage—to unlawful racial considerations. *Cooper*, 137 S. Ct. at 1463-64; see also *Bush v. Vera*, 517 U.S. 952, 971-73, 116 S. Ct. 1941, 135 L. Ed. 2d 248 (1996) (finding that the "extreme and bizarre" shape, paired with "overwhelming evidence that that shape was essentially dictated by racial considerations of one form or another" "reveal that political considerations were subordinated to racial classification"

38

because they were "unexplainable in terms other than race"); *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. ___, 137 S. Ct. 788, 798, 197 L. Ed. 2d 85 (2017) ("'[T]he constitutional violation' in racial gerrymandering cases stems from the 'racial purpose of state action, not its stark manifestation.' The Equal Protection Clause does not prohibit misshapen districts. It prohibits unjustified racial classifications." [Citation omitted.]); *Shaw*, 509 U.S. at 643 ("Classifications of citizens solely on the basis of race 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'").

Plaintiffs "may make the required showing through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 137 S. Ct. at 1463-64; see *Hunt v. Cromartie*, 526 U.S. 541, 549-50, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999).

Once plaintiffs have established that race was the predominant factor in how the lines were drawn, the burden shifts to the State to demonstrate that the legislation is narrowly tailored to achieve a compelling interest. *Cooper*, 137 S. Ct. at 1464; *Bethune-Hill*, 137 S. Ct. at 800-01; *Vera*, 517 U.S. at 958, 962 ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race. . . . For strict scrutiny to apply, traditional districting criteria must be *subordinated to race*."). Compliance with the federal Voting Rights Act may be a compelling state interest. *Cooper*, 137 S. Ct. at 1459 ("This Court has long assumed that one compelling interest is compliance with the Voting Rights Act of 1965 [VRA or Act]. When a State invokes the VRA to justify race-based districting, it must show [to meet the 'narrow tailoring' requirement] that it had 'good reasons' for concluding that the statute required its action.").

Other evidence that the Court has considered probative and significant in applying its "predominant factor" test has included direct testimony that racial quotas were set as goals to be met by the legislative body. See *Vera*, 517 U.S. at 969-70 ([T]he "testimony of state officials . . . affirmed that 'race was the primary consideration in the construction of District 30.'"). The Court also often looks to the shapes of the districts to see if it is "exceedingly obvious" that the drawing of the lines was a deliberate attempt to draw minority groups in or out of the district. See *Miller*, 515 U.S. at 917 ("[T]he drawing of narrow land bridges to incorporate within the district outlying appendages containing nearly 80% of the district's total black population was a deliberate attempt to bring black populations into the district."). But even a bizarre shape is not sufficient by itself; rather, it is a relevant factor because "it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale." *Bethune-Hill*, 137 S. Ct. at 798. Therefore the Court, when considering shape, has done so in conjunction with all other relevant factors to see if their combination is "'unexplainable in terms other than race.'" *Vera*, 517 U.S. at 972.

Additional factors the Court has examined in making this inquiry have included the racial densities in the population; whether testimony of state officials affirm that race was the primary consideration in the construction of a district; if the districting software used by the State provides only racial data at the block-by-block level; if there were "bizarre district lines" which were "tailored perfectly to maximize minority population" but were "far from the shape that would be necessary to maximize the Democratic vote" in the district; if the State had compiled detailed racial data but made no similar attempts to compile equivalent data regarding other communities; and if there were any conflicts or inconsistencies between the enacted plan and traditional redistricting criteria. *Miller*, 515 U.S. at 917; *Vera*, 517 U.S. at 967-73; *Bethune-Hill*, 137 S. Ct. at 799.

40

The Court has emphasized that in considering this kind of evidence, courts should examine whether "the legislature 'placed' race 'above traditional districting considerations in determining *which* persons were placed *in appropriately apportioned districts*'"—or "[i]n other words, if the legislature must place 1,000 or so additional voters in a particular district in order to achieve an equal population goal, the 'predominance' question concerns *which* voters the legislature decides to choose, and specifically whether the legislature predominately uses race as opposed to other, 'traditional' factors when doing so." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 273, 135 S. Ct. 1257, 191 L. Ed. 2d 314 (2015).

Second, a plaintiff may bring a minority voter dilution claim under section 2 of the Kansas Constitution Bill of Rights. This occurs when a legislative body invidiously discriminates against a minority population to minimize or cancel out the potential power of the group's collective vote. *Abbott v. Perez*, 585 U.S. ____, 138 S. Ct. 2305, 2314, 201 L. Ed. 2d 714 (2018). The harm caused by vote dilution "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931.

The evidentiary threshold for bringing a minority vote dilution claim in a single-member district is necessarily high. Plaintiffs bringing such a claim must first show three "threshold conditions":  (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single member district; (2) that the group is politically cohesive; and (3) there exists sufficient bloc voting by the white majority in the new allegedly diluted districts to usually defeat the preferred candidate of the politically cohesive minority bloc. *Growe v. Emison*, 507 U.S. 25, 39-40, 113 S. Ct. 1075,

122 L. Ed. 2d 388 (1993) (citing *Gingles*, 478 U.S. at 50-51). If a plaintiff fails to establish these three points, "there neither has been a wrong nor can [there] be a remedy." 507 U.S. at 40-41.

If all three preconditions are established, the next step is to consider the "totality of circumstances" to determine whether, as a result of the challenged plan, plaintiffs do not have an equal opportunity to participate in the political process and to elect candidates of their choice. *LULAC*, 548 U.S. at 425-26; see *Gingles*, 478 U.S. at 46; *2002 Substitute for House Bill 2625*, 273 Kan. at 720. Plaintiffs must establish that the totality of the circumstances shows that they lack equal opportunity before they can prevail on a vote dilution claim. *Bartlett v. Strickland*, 556 U.S. 1, 11-12, 24, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009) ("[O]nly when a party has established the [three] requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances. . . . Majority-minority districts are only required if all three . . . factors are met . . . .").

Evidence the Court has considered probative and significant in applying these standards to a minority voter dilution claim has included the list of factors contained in the Senate Report on the 1982 amendments to the Voting Rights Act, which includes considering the (1) history of voting-related discrimination in the state; (2) the extent to which voting in the elections of the state is racially polarized; (3) the extent to which the state has used voting practices tending to enhance opportunity for discrimination against the minority group; (4) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (5) the use of overt or subtle racial appeals in political campaigns; and (6) the extent to which members of the minority

group have been elected to public office in the jurisdiction. *LULAC*, 548 U.S. at 426; *Johnson v. De Grandy*, 512 U.S. 997, 1010 n.9, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994); *Gingles*, 478 U.S. at 36-38.

We note that while most vote dilution claims now arise in the context of the federal Voting Rights Act, they are undergirded by the same equal protection principles that preexist the VRA and simultaneously protect against unlawful minority vote dilution. See *Holder v. Hall*, 512 U.S. 874, 893 n.1, 114 S. Ct. 2581, 129 L. Ed. 2d 687 (1994) (Thomas, J., concurring) (explaining that "prior to the amendment of the Voting Rights Act in 1982, [vote] dilution claims typically were brought under the Equal Protection Clause. . . . The early development of our voting rights jurisprudence in those cases provided the basis for our analysis of vote dilution under the amended § 2 in *Thornburg v. Gingles*, 478 U.S. 30 [1986]."); see also McLoughlin, *Section 2 of the Voting Rights Act and City of Boerne: The Continuity, Proximity, and Trajectory of Vote-Dilution Standards*, 31 Vt. L. Rev. 39, 75-76 (2006) ("[A] strong conceptual link exists between the constitutional and statutory standards because dilutive effect is understood as essentially the same in both systems. Even if constitutional vote-dilution suits require additional proof of intent, the relationship between *Gingles*, *Rogers*, and the 1982 Amendments indicates that the injury targeted by the statute is identical to the constitutional injury with respect to the meaning of diminished clout in voting . . . . [T]he Court has never had an unconstitutional vote-dilution case involving single-member districts . . . [b]ut *Gingles* suggests that at minimum, its concept of diluted voting clout is no different from what the Court would look for in examining discriminatory effects in a constitutional vote-dilution case."); Pitts, *Georgia v. Ashcroft: It's the End of Section 5 As We Know It (and I Feel Fine)*, 32 Pepp. L. Rev. 265, 310-11 (2005) ("[T]he Section 2 standard strongly resembles the constitutional standard for proving unconstitutional vote dilution. . . . [T]he evidentiary factors considered under both the constitutional and statutory standards are nearly, though by no means precisely, identical.").

The dissent contends the three "threshold conditions" required to show race-based vote dilution are only a function of the Voting Rights Act and are unnecessary if an equal protection vote dilution claim is made. We disagree. First, this understanding is at odds with the Court's guidance in *Growe*. Second, we have found no decision in which a federal appeals court has concluded that redistricting, "although not in violation of section 2, unconstitutionally dilutes minority voting strength." *Johnson v. DeSoto County Bd. of Comm'rs*, 204 F.3d 1335, 1344 (11th Cir. 2000). Thus, federal courts have continued to apply the three "threshold conditions" required for a vote dilution claim under the VRA to similar claims asserted under the Equal Protection Clause. 204 F.3d at 1344 ("[T]he Supreme Court, historically, has articulated the same general standard, governing the proof of injury, in both section 2 and constitutional vote dilution cases."); *Lowery v. Deal*, 850 F. Supp. 2d 1326, 1331-32 (N.D. Ga. 2012), *aff'd on other grounds sub nom. Lowery v. Governor of Georgia*, 506 F. Appx. 885 (11th Cir. 2013) (unpublished opinion); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1326 (S.D. Fla. 2002) ("[E]ven though *Gingles* did not involve an equal protection claim, the three factors were derived by the Court from the principles set forth in the vote dilution cases brought under the Equal Protection Clause. We therefore conclude that the three preconditions have always been and remain elements of constitutional vote dilution claims."). If anything, the dissent's analysis, and the authority it relies upon, suggests a vote dilution claim asserted under the Equal Protection Clause requires a more rigorous showing than required under the VRA because the Equal Protection Clause requires a showing of discriminatory intent in addition to establishing the three "threshold conditions," while the VRA does not. *Lowery*, 850 F. Supp. 2d at 1331. Because plaintiff's claims fail here at the threshold, however, we need not engage the discussion of intent.

3. *On this record, plaintiffs have not established the elements of their race-based claims*

Having established the clear elements plaintiffs must prove to prevail on their racial gerrymandering and minority vote dilution claims under section 2, we turn to evaluating the district court's findings of fact to determine whether plaintiffs have in fact prevailed on their claims under either standard. We note here that it appears plaintiffs have principally pursued a claim of unlawful minority vote dilution. Counsel for the Alonzo plaintiffs explicitly acknowledged this at oral argument. Reviewing the record, however, plaintiffs do also allege racial discrimination in the way the Legislature treated minority communities in Douglas County and in our Native American communities. Additionally, because of the way the district court decided plaintiffs' race-based claims on standards unrelated to federal equal protection law, there is a lack of clarity concerning which of plaintiffs' claims—precisely—is being addressed by the district court's ruling. Because of this, giving plaintiffs the benefit of the doubt, we will review the lower court's findings to determine whether they support either of the two kinds of race-based claims that may be brought under section 2.

We review the findings of fact under the substantial competent evidence standard, disregarding any conflicting evidence or other inferences that might be drawn from the evidence. We exercise unlimited review over the conclusions of law based on those findings. *Gannon*, 305 Kan. at 881. In this unique instance, however, where the district court made findings of fact under a misperception of what the appropriate legal test would be, it will come as no surprise that the findings of fact do not match those required under the controlling legal frameworks. Even so, we will take the district court's findings at face value rather than delve into their evidentiary support (or lack thereof) and simply ask whether they are sufficient for the plaintiffs to have prevailed on their claims under the correct legal standard.

## a.   Plaintiffs have not established a racial gerrymandering claim

The record below demonstrates that plaintiffs did not ask the district court to find that the Legislature used race as the predominant factor in choosing where to draw the lines. The district court, in turn, did not apply this standard to plaintiffs' claim of racial gerrymandering. The district court—after erroneously holding that federal Fourteenth Amendment standards did not apply in the context of section 2—declined to answer whether intent is a required element of a racial discrimination claim under the Kansas Constitution Bill of Rights, concluding instead that "vote dilution is intentional . . . even in the absence of actual racial prejudice" "if the Legislature had as one objective the dilution of minority voters."

As we have described, however, for plaintiffs to prevail on a claim of racial gerrymandering, they must have shown that the Legislature used race as the *predominant factor* in drawing districts. The Supreme Court has clearly stated that if the evidence merely shows that the Legislature considered partisan factors "along with" race when it drew the lines, this, without more, "says little or nothing about whether race played a *predominant* role." *Easley*, 532 U.S. at 253.

Plaintiffs, like the district court, made much of the fact that partisan considerations dominated the Legislature's map-drawing process, but failed to present any evidence that race was the predominant factor guiding the Legislature's decisions. The district court expressly adopted conclusions from plaintiffs' expert witnesses that "partisan intent predominated" in the drawing of the districts. The district court found that the "Legislature acted with discriminatory intent," but did so only after crafting a test that did not test for predominant intent at all. The court failed to conduct the appropriate "'sensitive inquiry'" to assess whether plaintiffs "managed to disentangle race from politics and prove that the former drove a district's lines." *Cooper*, 137 S. Ct. at 1473;

46

see also *Easley,* 532 U.S. at 245 ("A legislature trying to secure a safe Democratic seat is interested in Democratic voting behavior. Hence, a legislature may, by placing reliable Democratic precincts within a district without regard to race, end up with a district containing more heavily African-American precincts, but the reasons would be political rather than racial."); *Shaw*, 509 U.S. at 646 ("[T]he legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination. . . . [W]hen members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes. The district lines may be drawn, for example, to provide for compact districts of contiguous territory, or to maintain the integrity of political subdivisions."); *Cooper*, 137 S. Ct. at 1490 (Alito, J., concurring) (pointing out the "often-unstated danger where race and politics correlate:  that the federal courts will be transformed into weapons of political warfare. Unless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, . . . they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena. If the majority party draws districts to favor itself, the minority party can deny the majority its political victory by prevailing on a racial gerrymandering claim. Even if the minority party loses in court, it can exact a heavy price by using the judicial process to engage in political trench warfare for years on end.").

The district court did not find that race was the predominant factor motivating the Legislature's decision to place a significant number of voters inside or outside of a particular district. We therefore conclude that on the record before us, plaintiffs have failed to satisfy their burden to meet the legal elements required for a showing of racial gerrymandering.

47

b.  Plaintiffs have not established a minority vote dilution claim

Plaintiffs' claims of minority vote dilution fail at the very first step, because the record below shows that they did not present evidence in support of—nor did the district court find—that the minority group is sufficiently large and geographically compact to constitute a majority in a single member district. The district court did not conduct this analysis, and the numbers in the Ad Astra 2 map suggest that this first condition may very well be impossible to meet. In fact, plaintiffs admit in their petition that "minority voters constitute less than a majority of voters in current District 3" and require "the support of a portion of white voters who cross over to support the minority-preferred candidate."

The district court simply did not apply the proper test or make the requisite findings of fact to satisfy the standards necessary to prove a claim of minority vote dilution. The district court generally incorporated and credited plaintiffs' suggested findings of fact. However, the district court made very few specific findings of fact of its own to directly justify its holdings, instead simply summarizing plaintiffs' expert testimony. In a similar scenario, the U.S. Supreme Court has concluded this type of fact-finding was insufficient to support a claim for vote dilution:

> "[P]laintiffs urge us to put more weight on the District Court's findings of packing and fragmentation, allegedly accomplished by the way the State drew certain specific lines . . . . The District Court, however, made no such finding. Indeed, the propositions the court recites on this point are not even phrased as factual findings, but merely as recitations of testimony offered by plaintiffs' expert witness. While the District Court may well have credited the testimony, the court was apparently wary of adopting the witness's conclusions as findings. But even if one imputed a greater significance to the accounts of testimony, they would boil down to findings that several of [the] district lines separate portions of Hispanic neighborhoods, while another district line draws several

48

Hispanic neighborhoods into a single district. This, however, would be to say only that lines could have been drawn elsewhere, nothing more. But some dividing by district lines and combining within them is virtually inevitable and befalls any population group of substantial size." *De Grandy*, 512 U.S. at 1015-16.

Even if, as the Court contemplated in *De Grandy*, we "imputed a greater significance to the accounts of testimony" and fully accept the district court's crediting of one of plaintiffs' expert's analysis that Ad Astra 2 has a "dilutive effect on the ability of minority voters to elect their preferred candidates," this statement skips several steps along the analytical path. Had the district court conducted a proper inquiry, it may have never even gotten that far in its analysis because the very first condition—which again, requires the minority group to be sufficiently large and geographically compact to constitute a majority in a single member district—very likely would have been fatal to the plaintiffs' claims. See *Growe*, 507 U.S. at 40-41 ("[T]here neither has been a wrong nor can [there] be a remedy" if plaintiffs fail to establish the three preconditions.).

Accordingly, we conclude that on the record before us, plaintiffs have failed to satisfy their burden to meet the legal elements required for a showing of unlawful race-based vote dilution.

CONCLUSION

The manner in which plaintiffs chose to litigate this case—and the district court's willingness to follow them down the primrose path—has a great deal to do with our decision today. Plaintiffs put their proverbial eggs in an uncertain and untested basket of novel state-based claims, hoping to discover that the Kansas Constitution would prove amenable. But the constitutional text and our longstanding historical precedent foreclose those claims. In the future, should the people of Kansas choose to codify clear standards limiting partisan gerrymandering, or should future plaintiffs be able to properly establish

49

the elements legally required to show unlawful racial discrimination in the redistricting process, Kansas courthouse doors will be open. For now, the legal errors permeating the lower court's decision compel us to reverse its judgment.

Reversed and injunction order is lifted.

* * *

ROSEN, J., concurring in part and dissenting in part: The dominant political party in our Legislature recently reapportioned Kansas congressional districts in such a manner as to dilute—or eliminate—the voting rights of racial minorities as well as to propel this state's national political power toward a monolithic single-party system. The majority of our court today gives its stamp of approval to this assault on the democratic system and the constitutional backbone of our democracy. Because I cannot countenance the subversion of the democratic process to create a one-party system of government in this state and to suppress the collective voice of tens of thousands of voters, I dissent.

In turning a blind eye to this full-scale assault on democracy in Kansas, the majority blithely ignores the plain language of this state's Constitution. The majority upholds a legislative decision that does nothing to benefit the people or provide equal protection to the citizens of this state, considerations our Constitution expressly demands. Furthermore, the majority opinion undermines the very basis of legislative districting, apportioning voting districts in a blatant attempt to homogenize the state. As the Legislature has distorted and contorted the political map in order to monopolize the position of one political party, the majority opinion distorts and contorts legal reasoning and constitutional theory to uphold racial discrimination and political chicanery.

The precedent today's opinion sets threatens to institutionalize division of voting districts on the basis of race, or of religion, or of gender, with no hope of constitutional protection. The majority is thus complicit not only in the current power grab, it also promises future legislatures that they may with impunity divide and subdivide voters' interests to further the purposes of whichever party is in a position to seize absolute control.

I do not reject the majority opinion out of sympathy for one party or another or for one population or another. I reject it because it is constitutionally unsound. I fully join Justice Biles in his concurring in part and dissenting in part opinion and his legal analysis and his conclusion that Ad Astra 2 violates the Kansas Constitution. To that opinion, I add one of my own so that I may highlight my fervent disagreement with the majority's decision to tie the equal protection guarantees in section 2 of the Kansas Constitution Bill of Rights to the federal Constitution.

Early in its opinion, the majority quickly and matter-of-factly pronounces that "the equal protection guarantees found in section 2 are coextensive with the equal protection guarantees afforded under the Fourteenth Amendment to the United States Constitution." Slip op. at 22. With these few taps on a keyboard, the majority denies Kansans the very thing our founders envisioned:  a people's government that fervently guards the people's equal benefit from and access to the law—regardless of what the narrower-in-scope central power has to say about it. I will highlight the error in the majority's minimal reasoning and explain why section 2 provides protections that are broader than those in the Fourteenth Amendment.

Section 2 of the Kansas Constitution Bill of Rights is as follows:

"Political power; privileges. All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal

51

protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

The relevant portion of the Fourteenth Amendment to the United States Constitution is as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The majority looks at these provisions and proclaims that the equal protection guarantees found within are coextensive. To get to that epic conclusion, it relies on one sentence offered in a 1917 Kansas case and repeated in a smattering of cases, each time without even a hint of analysis. In *State v. Wilson*, 101 Kan. 789, 795-96, 168 P. 679 (1917), this court unceremoniously noted that sections 1 and 2 of the Kansas Bill of Rights are "given much the same effect as the clauses of the Fourteenth Amendment relating to due process of law and equal protection." For this proposition, it cited to *Winters v. Myers*, 92 Kan. 414, 140 P. 1033 (1914). But the court in *Winters* never held that section 2 and the Fourteenth Amendment are given the same effect. Rather, it observed that the Ohio Constitution has a provision with the same language as section 2 and that there is *similar* language in a clause of the Fourteenth Amendment. The court then described caselaw from both jurisdictions, among others, before independently addressing the equal protection issue before it. *Winters*, 92 Kan. at 421-28.

Nonetheless, the language in *Wilson* was repeated in cases in which parties launched Fourteenth Amendment claims alone and when parties invoked the Kansas Bill

52

of Rights alongside a Fourteenth Amendment claim. See, e.g., *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005); *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981); *Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 (1974); *Railroad and Light Co. v. Court of Industrial Relations*, 113 Kan. 217, 228-29, 214 P. 797 (1923). Importantly, however, in none of these cases does it appear the parties claimed that the Kansas Constitution Bill of Rights offers different or broader protections than the Fourteenth Amendment. Thus, in none of these cases did the court question whether Kansas affords separate protections and instead defaulted to the status quo.

This practice was routine for the time. "For all practical purposes, independent state constitutionalism did not exist before the 1970s." Friedman, *Path Dependence and the External Constraints on Independent State Constitutionalism*, 115 Penn St. L. Rev. 783, 797 (2011). Commentors have theorized this was largely a result of "constitutional universalism," or a "belief that all American constitutions are drawn from the same set of universal principles of constitutional self-governance." Gardner, *The Positivist Revolution That Wasn't: Constitutional Universalism in the States*, 4 Roger Williams U.L. Rev. 109, 117 (1998). In the judicial context, this belief resulted in "a lack of judicial attention to or discussion of the constitutional text, case authority, framers' intent, or relevant history [and] indiscriminate borrowing from other jurisdictions . . . and from the common law." 4 Roger Williams U.L. Rev. at 117. And later in the 20th century, sole reliance on the Fourteenth Amendment became a strategic decision. "The U.S. Supreme Court recognized many of the rights it did between the 1940s and the 1960s *because* many state courts (and state legislatures and state governors) resisted protecting individual rights, most notably in the South but hardly there alone." Sutton, Jeffery, J., 51 Imperfect Solutions: States and the Making of American Constitutional Law, 14 (2018). Thus, litigants eschewed the advancement of any state constitutional claims to take advantage of the federal rights expansion.

In the late 1970s, however, after a near-decade of continuous individual rights recognition came to an end, an era of "independent state constitutionalism in the area of individual rights and liberties came of age." 115 Penn St. L. Rev. at 798. An approach coined "The New Judicial Federalism" took hold during this period, and marked a time when state courts took a deeper look at their own constitutions and "interpreted their . . . rights provisions to provide more protection than the national minimum standard guaranteed by the Federal Constitution." Williams, *Introduction: The Third Stage of the New Judicial Federalism*, 59 N.Y.U. Ann. Surv. Am. L. 211, 211 (2003). Justice William Brennan recognized this as "'probably the most important development in constitutional jurisprudence of our times.'" Williams*, The New Judicial Federalism in Ohio: The First Decade*, 51 Clev. St. L. Rev. 415, 416 (2004) (quoting Justice William J. Brennan, Jr., Special Supplement, State Constitutional Law, NAT'L L.J., Sept. 29, 1986, at S1).

Our court appeared to follow this trend beginning in 1984 in *Farley v. Engelken*, 241 Kan. 663, 667, 740 P.2d 1058 (1987). Curiously, the majority here cites *Farley* as supportive of its position not once, but twice. In *Farley*, this court considered an equal protection challenge to legislation that implicated the right to a remedy for insured or otherwise compensated medical malpractice plaintiffs but not other tort plaintiffs. True to the majority's quotation, *Farley* initially repeats the resolution that section 2 and the Fourteenth Amendment are "given much the same effect." 241 Kan. at 667. However, later in its reasoning it clarifies "*as hereinafter demonstrated, the Kansas Constitution affords separate, adequate, and greater rights than the federal Constitution.*" (Emphasis added.) 241 Kan. at 671. The court reached that conclusion by relying on earlier caselaw that had applied a heightened standard to a similar equal protection challenge and by observing that the right to a remedy is independently protected by the Kansas Constitution, thus making it deserving of scrutiny higher than rational basis under the Kansas Constitution. The court acknowledged that the "United States Supreme Court has

54

applied heightened scrutiny to very limited classifications," but explained "we are interpreting the Kansas Constitution and thus are not bound by the supremacy clause of the federal Constitution." 241 Kan. at 674.

The majority here conveniently avoids addressing this precedent-setting portion of the *Farley* opinion, likely because it threatens to topple the jenga-style analysis it has constructed. The majority has offered nothing beyond *Farley* and the other cases that reflexively repeated the line from *Wilson* to bind Kansas' section 2 to the Fourteenth Amendment and federal court decisions. The opinion takes a moment to ensure the reader that our decision in *Hodes & Nauser*, *MDs v. Schmidt*, 309 Kan. 610, 624, 440 P.3d 461 (2019), which interpreted section 1 of the Kansas Constitution to offer protections not found in the federal Constitution, does not bind our interpretation of section 2, but that is the extent of the analysis.

Instead of offering a sound interpretation of section 2, the majority uses a few sentences to tie equal protection guarantees in section 2 to those in the Fourteenth Amendment for now and the future. Legal analysts have described this approach as "prospective lockstepping," i.e., when a court "announces that not only for the instant case, but also in the future, it will interpret the state and federal clauses the same." Williams, *State Courts Adopting Federal Constitutional Doctrine:  Case-by-Case Adoptionism or Prospective Lockstepping?*, 46 Wm. & Mary L. Rev. 1499, 1509 (2005). Commenters have identified numerous problems with this practice. Among those is that resulting opinions "decide too much and . . . go beyond the court's authority to adjudicate cases" by "purport[ing] to foresee, and to attempt to control, the future." 46 Wm. & Mary L. Rev. at 1521. Justice Robert Utter of the Supreme Court of Washington has likened this to a judicial constitutional amendment without a constitutional convention. *State v. Smith*, 117 Wash. 2d 263, 282, 814 P.2d 652 (1991) (Utter, J., concurring). Another defect with the practice is the reality that it "reduces state constitutional law to a

redundancy and greatly discourages its use and development." Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich. L. Rev. 761, 804 (1992); see also *Harris v. Anderson*, 194 Kan. 302, 314, 400 P.2d 25 (1965) (Fatzer, J., dissenting) ("[a]cquiescence in decisions of the Supreme Court" should not go so far as to "engender[] a docile submission" or "become a servile abasement"). This reduction into irrelevance threatens a most grave consequence: the elimination of the constitutional protections our founders envisioned. As Judge Jeffrey Sutton of the Sixth Circuit has explained, state courts cannot rely on the U.S. Constitution to vindicate individual rights protected in state constitutions because "[f]ederalism considerations may lead the U.S. Supreme Court to underenforce (or at least not to overenforce) constitutional guarantees in view of the number of people affected and the range of jurisdictions implicated." 51 Imperfect Solutions at 175.

I could continue at length about the problems with the majority's lack of analysis and its chosen approach. Instead, I turn to what it should have tackled in the first place: an examination of the Kansas Constitution.

The district court in this case, relying on *Farley*, ruled that "Kansas's guarantee of equal benefit 'affords separate, adequate, and greater rights than the federal Constitution.'" See 241 Kan. at 671. I agree. But I go beyond *Farley* to get there, starting with the text of section 2.

The first thing about section 2's text that the majority ignores is the most obvious: it is different from the text in the Fourteenth Amendment. This—"[a]ll political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit"—is not the same as this—"No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." I do not mean to oversimplify things; it really is that simple. See Linde, *E Pluribus, Constitutional*

*Theory and State Courts*, 18 Ga. L. Rev. 165, 182 (1984) (state court is responsible for reaching its own conclusion about state constitutional provisions regardless of whether identical language exists in the federal Constitution, but "[a] textual difference" between the two "makes this easier to see").

The details in the differences between these provisions are even more illuminating. Section 2 describes a free government that is instituted for the people's equal protection and benefit. In contrast, the Fourteenth Amendment prohibits states from denying anyone equal protection of laws. One is a positive conferral of rights; the other is framed in the negative. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 894, 179 P. 3d 366 (2008) (observing that the federal Constitution grants "negative rights—*i.e.*, rights which the government may not infringe," while "state constitutions, including Kansas', grant negative rights" *and* "positive rights, *i.e.*, rights that entitle individuals to benefits or actions by the state"). The Supreme Court of Vermont has observed the same distinction between its equal benefit clause and the Fourteenth Amendment. As originally written, the Vermont provision proclaimed, "That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family or set of men, who are a part only of that community . . . ." *Baker v. State*, 170 Vt. 194, 207, 744 A.2d 864 (1999). In comparing this provision to the federal Equal Protection Clause, the Vermont Supreme Court had this to say:

> "The first point to be observed about the text is the affirmative and unequivocal mandate of the first section, providing that government is established for the common benefit of the people and community as a whole. Unlike the Fourteenth Amendment, whose origin and language reflect the solicitude of a dominant white society for an historically-oppressed African-American minority (no state shall 'deny' the equal protection of the laws), the Common Benefits Clause mirrors the confidence of a homogeneous, eighteenth-century group of men aggressively laying claim to the same rights as their peers in Great Britain or, for that matter, New York, New Hampshire, or the Upper Connecticut River Valley.

. . . .

> ". . . . The affirmative right to the 'common benefits and protections' of government and the corollary proscription of favoritism in the distribution of public 'emoluments and advantages' reflect the framers' overarching objective 'not only that everyone enjoy equality before the law or have an equal voice in government but also that everyone have *an equal share in the fruits of common enterprise*.' . . . Thus, at its core the Common Benefits Clause expressed a vision of government that afforded every Vermonter its benefit and protection and provided no Vermonter particular advantage. [Citations omitted.]" *Baker*, 170 Vt. at 208-09.

Like the Vermont Constitution, section 2 describes an "affirmative right" to equal protections and benefits. And, like the Vermont Supreme Court, I understand this to be a broader conferral of rights than that which results from the proscription of denying citizens equal protection of the law. The history surrounding this text confirms my understanding.

Kansans ratified the Kansas Constitution, including the section 2 we know today, in 1859. This was nine years before the ratification of the Fourteenth Amendment. *Hodes*, 309 Kan. at 624. There is no discussion of section 2's meaning or origins in the record of the Wyandotte Constitutional Convention that produced the Constitution. See Proceedings and Debates of the Kansas Constitutional Convention (Drapier ed., 1859), *reprinted in* Kansas Constitutional Convention 187, 286, 575, 599 (1920). But it was quite surely based on other, earlier constitutions. See Mauer, *State Constitutions in a Time of Crisis: The Case of the Texas Constitution of 1876*, 68 Tex. L. Rev. 1615, 1617 (1990) (the writing of state constitutions has been largely an imitative art). Section 2 is nearly identical to a provision in the 1851 Ohio Constitution: "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same." Ohio Const. art. I, § 2. And both

Kansas and Ohio's Constitutions model the 1776 Virginia Declaration of Rights and the 1776 Pennsylvania Constitution. Both proclaimed that "government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community." Va. Const. Bill of Rights, art. I, § 3; Pa. Const. Bill of Rights, art. V; *Stolz v. J & B Steel Erectors, Inc.*, 155 Ohio St. 3d 567, 575, 122 N.E.3d 1228 (2018) (Fischer, J., concurring) (observing Ohio provision is like Virginia and Pennsylvania provisions). This lineage helps trace at least part of the origins of our section 2 back to 1776, when the original colonies were writing the first state constitutions. See Wood, *Foreword: State Constitution-Making in the American Revolution*, 24 Rutgers L.J. 911, 913 (1993).

Legal commenters point out that provisions like these are common to state constitutions. See Bulman-Pozen & Seifter, *The Democracy Principle in State Constitutions*, 119 Mich. L. Rev. 859, 870, 892 (2021) (describing similar provisions, including that found in Colorado's Constitution: "all government, of right, originates from the people, is founded upon their will only, and is instituted solely for the good of the whole"). This category of constitutional decrees focuses first on what is to be the source of all political power—the people. The early drafters had recently declared independence from the British government and its attempt to crush local community rule, and their desire to stay independent and self-governed is reflected in these provisions. See Linzey & Brannen, *A Phoenix from the Ashes: Resurrecting a Constitutional Right of Local, Community Self-Government in the Name of Environmental Sustainability*, 8 Ariz. J. Envtl. L. & Pol'y 1, 16 (2017). In naming the people as the source of all government power, they "established popular sovereignty as that state's legal cornerstone." Amar, *The Consent of the Governed: Constitutional Amendment Outside Article V*, 94 Colum. L. Rev. 457, 477 (1994). The provisions detail not just the source of power, but the ends of that power—the common good. 119 Mich. L. Rev. at 892.

In dedicating the people's power to the common good, the earliest framers "condemned special treatment of individuals and classes." 119 Mich. L. Rev. at 892. As the United States continued to form, the constitutional commitment to the common good intensified. In the decades leading to Kansas' admission to the union, state legislatures had begun to stray from the peoples' objectives and started to prioritize the interests of the few. 119 Mich. L. Rev. at 892. In response, various states adopted constitutional amendments that placed specific restrictions on legislative acts. This reaction continued in a more general form in the 1840s and 1850s, when states began adopting constitutional equality guarantees to curb the perceived favoritism. 119 Mich. L. Rev. at 893; James Willard Hurst, The Growth of American Law: The Law Makers 241 (1950). ("The persistent theme of the limitations written into state constitutions after the 1840's was the desire to curb special privilege.").

It was against this backdrop that both Ohio and Kansas drafted their first constitutions. Quite notably, their political power provisions were written to guarantee not just protection and benefit for the common good, but *equal* protection and benefit. This indicates a strong dedication to the longevity of popular sovereignty and a prohibition against government action that results in special favor to the few. This casts a broad and generous net in the equal protection arena.

The Fourteenth Amendment has a radically different conception story. It was ratified in 1868, three years after the end of the Civil War. Its drafters were not concerned "with favoritism" or "the granting of special privileges for a select few," but with the still widespread discrimination against formerly enslaved persons and African Americans generally. *Matter of Compensation of Williams*, 294 Or. 33, 42, 653 P.2d 970 (1982). Although the Thirteenth Amendment abolished the legal practice of slavery in 1865, it made no guarantee of citizenship or civil rights to Black people in America. *Dred Scott* still loomed over the land, as did *Barron v. The Mayor and City Council of Baltimore*, 32

60

U.S. 243, 250-51, 8 L. Ed. 672 (1833), which held that the federal Bill of Rights did not apply to the states. As a result, southern states were able to systematically deny rights to Black people. The Fourteenth Amendment was Congress' direct response to these continuing human rights abuses. Maggs, *A Critical Guide to Using the Legislative History of the Fourteenth Amendment to Determine the Amendment's Original Meaning*, 49 Conn. L. Rev. 1069, 1083-86 (2017); Shaman, *The Evolution of Equality in State Constitutional Law*, 34 Rutgers L.J. 1013, 1052 (2003) ("As envisioned by its framers, the central purpose of the Equal Protection Clause was to eliminate hostile discrimination against the newly freed slaves.").

The text and the historical distinction between the origins of section 2 and the Fourteenth Amendment make it plain that the declarations have separate meanings. While the federal provision's devotion to ensuring civil rights for Black people in America is an important and historic part of our legal history, its concept is less broad than that of section 2. Like the Vermont Supreme Court has described its counterpart clause, section 2 represents a constitutional guarantee that "the law uniformly afford[s] every [Kansan] its benefit, protection, and security so that social and political preeminence [will] reflect differences of capacity, disposition, and virtue, rather than governmental favor and privilege." *Baker*, 170 Vt. at 211.

The majority has decided to ignore the plain text and the history of our section 2. I would not have done so. Rather, at the plaintiffs' prompting, I would have given it the full examination and analysis the people of Kansas deserve and concluded that it is a rich and generous declaration that guarantees the people of Kansas protections that are broader than those found in the federal Equal Protection Clause. This reflection would support the legal framework and conclusion my dissenting colleagues present today: Ad Astra 2's invidious discrimination against people based on past political speech and race certainly

61

presents a justiciable question and clearly violates the protections enshrined in the Kansas Constitution.

\* \* \*

BILES, J., concurring in part and dissenting in part: I agree the federal Elections Clause does not jurisdictionally bar this court from considering the validity of legislatively enacted congressional district maps under the Kansas Constitution. But I agree with little else in the majority opinion, so I dissent from the rest.

These circumstances cry out for judicial review. The district court's factual findings lay bare how this "Ad Astra 2" legislation intentionally targets fellow Kansans because of their voting history, their prior expression of political views, their political affiliations, and the color of their skin. One such finding declares, "Ad Astra 2 relocates more Black, Hispanic, and Native American Kansans than any of the comparator plans, *meaning the changes in district boundaries were focused on areas with large minority populations*." (Emphasis added.) Other findings hold the Ad Astra 2 design contains noncompact and irregularly shaped districts, unnecessarily splits political subdivisions (cities and counties), breaks up geographically compact communities of interest, and fails to preserve the cores of former districts. Yet the majority believes most of these injustices are beyond the reach of mere judges, while conceding only that the mathematical calculations and limited race dilution issues are in our judicial wheelhouse.

The district court's findings plainly implicate state-based constitutional rights, so an appellate court's first duty should be to decide whether they are supported by substantial competent evidence. After that, the legal analysis is garden-variety stuff. This court said as much nearly 45 years ago. See *In re House Bill No. 2620*, 225 Kan. 827, Syl. ¶ 4, 595 P.2d 334 (1979) ("Substantially equal [legislative] districts may be

invidiously discriminatory because they were organized in such a way as to minimize or cancel out the voting strength of racial or political elements of the voting population."). So why doesn't the majority fully engage?

Our state's founding and its traditions teach us that government is at its worst when those at the helm stop treating people like neighbors. And the district court explicitly found the "asserted pretextual justifications for Ad Astra 2 . . . cannot withstand scrutiny." This means the State's explanations about why this legislation does what it does don't hold water. So what should be the appropriate judicial response when state action appears to cross constitutional boundaries and the government's excuses are lame? Retreat is not the answer. See Kansas Const. art. 3, § 1 ("The judicial power of this state shall be vested exclusively in one court of justice."). Courts must intervene because a desire to harm politically disfavored groups is not a legitimate government interest and our duty is to the Constitution.

I can't abide by the majority's decision to look the other way by invoking the political question doctrine for the first time in this context. And when I apply the legal analysis to the established facts, I don't like what I see. I also would apply a state-based analysis to the race-based claims under the Kansas Constitution. I would affirm the district court although my rationale differs in a few places. Let's begin with what happened.

FACTUAL BACKGROUND

This stage was set 10 years ago when there was a failure to enact a new congressional redistricting plan after the Governor and Legislature could not agree on one. This required a federal district court to step in and fill the void. See *Essex v. Kobach*, 874 F. Supp. 2d 1069 (2012). But over the next decade, population shifts made the federal court's design inconsistent with applicable one person/one vote principles, so

63

revision became necessary. And to achieve equal populations among our state's four congressional districts, minimal shifts of about 116,000 people would have done the trick. Each congressional district needed 734,470 people. This table makes that point:

| District | 2020 Census Population | Change Required |
|---|---|---|
| First | 700,773 | + 33,855 |
| Second | 713,007 | + 21,803 |
| Third | 792,286 | -58,334 |
| Fourth | 731,814 | +2,676 |
| | | Net Shift Needed: 116,668 people (3.9% of state's population) |

But Ad Astra 2 does so much more. It moves 394,325 people into new congressional districts—or 13.4% of our state's population. Said differently, for every Kansan the Legislature needed to move, it transferred more than three. And as the district court found, "[t]his significant shift of population between districts was not the necessary result of population changes within the state between 2010 and 2020, nor the result of Kansas'[] political geography." Ad Astra 2 affected 14 Kansas counties in this way:

| County | Old Districts 2012-2022 | New Districts Ad Astra 2 | Residents Moved (2020 Census data) |
|---|---|---|---|
| Wyandotte | Third | Second (portion) | 112,661 |
| Douglas | Second | First (portion) | 94,934 |
| Geary | First | Second | 36,379 |
| Lyon | First | Second | 32,179 |
| Franklin | Second | Third | 25,643 |
| Miami | Second/Third | Third | 20,495 |
| Jefferson | Second | First | 18,974 |

| | | | |
|---|---|---|---|
| Jackson | Second | First | 13,249 |
| Marion | First | Second | 11,823 |
| Anderson | Second | Third | 7,877 |
| Chase | First | Second | 2,572 |
| Wabaunsee | First | Second | 6,877 |
| Morris | First | Second | 5,386 |
| Marshall | First/Second | First | 5,276 |

Even a casual observer would wonder what possibly motivates this much population transfer to our election-year landscape—especially when a traditional guidepost for neutral redistricting calls for retaining core districts. See, e.g., The Proposed Guidelines and Criteria for 2022 Kansas Congressional and State Legislative Redistricting, subsection 4(c) ("The core of existing congressional districts should be preserved when considering the communities of interest to the extent possible."); see also *Essex*, 874 F. Supp. 2d at 1089 ("The Court's plan most effectively furthers state goals of creating compact and contiguous districts, preserving existing districts, maintaining county and municipal boundaries and grouping together communities of interest.").

The district court noted Ad Astra 2 preserves just 86% of the former districts' cores, while a "least-change plan" adhering to the legislative redistricting committee guidelines for core retention retained 97%. This disregard for core retention is strikingly illustrated by how Ad Astra 2 surgically scoops out the densely populated City of Lawrence from Douglas County to submerge it in a new congressional district stretching as far west as Colorado and encompassing a large portion of the Oklahoma border. The rest of Douglas County stays in CD 2. The district court ultimately found based on the evidence before it that, "Ad Astra 2 cannot be justified by a desire to retain the cores of prior congressional districts."

Plaintiffs filed suit alleging this intentional government action violated their rights protected by sections 1, 2, 3, 11, and 20 of the Kansas Constitution Bill of Rights and article V, section 1 of the Kansas Constitution. The district court agreed with plaintiffs in a 209-page decision after a four-day trial. And except for the extraordinary time considerations that expedite this case, the analysis is straightforward and for half a century familiar territory for Kansas courts.

## THE PARTISAN GERRYMANDERING CLAIMS

At the outset, it is necessary to understand what we are talking about. The district court's central holdings concern what it labels and defines as "partisan gerrymandering." The important part is the definition. It is too simplistic to just think of this as Republicans being mean to Democrats (or vice versa), or to trivialize what happened with an "Elections Have Consequences" bromide. The majority falls victim to that in my view when it mischaracterizes this case as seeking something that is unattainable—an absolute prohibition against any partisanship in the legislative process. Slip op. at 24 (stating plaintiffs "claim that any consideration by the Legislature of partisan factors in deciding where to draw district lines is offensive to constitutional principles"). Plaintiffs' claims and this case do no such thing. The district court made clear it was ruling on something much more substantial and sweeping than political bickering.

The district court showed its hand early. It broadly defined the elements of "partisan gerrymandering" as: (1) the Legislature acting with the purpose of achieving partisan gain by diluting the votes of disfavored-party members, and (2) the enacted congressional plan having the desired effect of substantially diluting disfavored-party members. It then fleshed out the gravity of what it was looking for by noting the goal of partisan gerrymandering "is to eliminate the people's authority over government by

66

giving different voters vastly *unequal* political power." And it explained how the harm occurs:

"[I]n at least three related, but independent ways. First, partisan gerrymandering unconstitutionally discriminates against members of the disfavored party based on viewpoint. Second, partisan gerrymandering unlawfully burdens disfavored-party members' freedom of association. Third, partisan gerrymandering unlawfully retaliates against disfavored-party members for engaging in protected political speech and association."

The court then narrowed its focus even further, to make this about government retaliation. It said:

"The State engages in impermissible retaliation when plaintiffs can establish that (1) they were engaged in a constitutionally protected activity; (2) the State's actions adversely affected the protected activity; and (3) the State's adverse action was substantially motivated by plaintiffs' exercise of their constitutional rights."

Ultimately, the district court held:

"Partisan gerrymandering satisfies all three of these elements. First, as described above, voters seek to engage in protected activities, including exercising their right to free speech and assembly by forming political parties, voicing support for their candidates of choice, and casting votes for those candidates. Second, partisan gerrymandering burdens these rights by reducing the voting power of members of the disfavored party, discriminating against members of that party on the basis of their viewpoints, and burdening their ability to associate by obstructing their political organizations. Third, the State's actions are motivated by voters' exercise of their constitutional rights: Partisan gerrymanderers move voters for the disfavored party into different districts precisely because those voters are likely to engage in protected conduct."

67

I share the district court's singular focus. This is about targeted government action against disfavored Kansans based on how they exercise their constitutional rights. And in that regard, I have been haunted by this 64-year-old passage on associational rights written by Justice John Marshall Harlan II in a unanimous decision:

> "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. . . . Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny. [Citations omitted.]" *National Ass'n for Advancement of Colored People v. Alabama*, 357 U.S. 449, 460-61, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958).

Partisan gerrymandering assaults these associational freedoms and their related constitutional protections. But before diving into those details, let's first consider the majority's decision to disembark before doing even that much by ruling plaintiffs' claims on partisan gerrymandering do not present a justiciable case or controversy.

*The political question doctrine*

It is important to appreciate the judicial bait-and-switch that has happened. First, the United States Supreme Court held in a recent 5-4 decision that federal courts must avoid partisan gerrymandering claims from the various states. *Rucho v. Common Cause*, 588 U.S. ___, 139 S. Ct. 2484, 2499-500, 204 L. Ed. 2d 931 (2019). But in doing so, the Court's majority noted state courts were still available to stand guard against constitutional mischief. 139 S. Ct. at 2507 ("Our conclusion does not condone excessive

partisan gerrymandering. Nor does our conclusion condemn complaints about districting to echo into a void. . . . Provisions in state statutes and state constitutions can provide standards and guidance for state courts to apply.").

Plaintiffs here dutifully followed *Rucho*'s prompt and brought their case against Ad Astra 2 to state court, even though federal court is where these issues had been heard in our state over the past several decades. See, e.g., *Essex*, 874 F. Supp. 2d 1069*; State ex rel. Stephan v. Graves*, 796 F. Supp. 468 (1992); *O'Sullivan v. Brier,* 540 F. Supp. 1200 (1982). Plaintiffs' redeployment to state court might explain why the *Rivera* majority labels this case as "first-of-its-kind litigation." Slip op. at 6. But that's a misnomer because their underlying redistricting claims are traditional in context—despite the majority's tagging them as "unique and novel." Slip op. at 6; see, e.g., *In re 2002 Substitute for Senate Bill 256*, 273 Kan. 731, Syl. ¶ 4, 45 P.3d 855 (2002) ("Lack of contiguity or compactness of districts in reapportionment legislation raises immediate questions as to political gerrymandering and possible invidious discrimination which should be satisfactorily explained by some rational state policy or justification."); *In re House Bill No. 3083*, 251 Kan. 597, 607, 836 P.2d 574 (1992) (same); *In re House Bill No. 2620*, 225 Kan. 827, Syl. ¶ 4 (even substantially equal legislative districts may be invidiously discriminatory if organized to minimize or cancel out the voting strength of racial or political elements of the voting population).

But the *Rivera* majority slams the courthouse door shut by declaring:  "[W]e can discern no judicially manageable standards by which to judge a claim that the Legislature relied too heavily on the otherwise lawful factor of partisanship when drawing [congressional] district lines." Slip op. at 2, Syl. ¶ 6. And the discouraging by-product is judicial passivity at precisely a moment when a Kansas court has held the rights of Kansans guaranteed by our state Constitution are in the balance. It should go without saying this is not a time to stand down. See, e.g., *Harris v. Shanahan*, 192 Kan. 183, 206-

07, 387 P.2d 771 (1963) ("[W]hen legislative action exceeds the boundaries of authority limited by our Constitution, and transgresses a sacred right guaranteed or reserved to a citizen, final decision as to invalidity of such action must rest exclusively with the courts. . . . However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it.").

Nor does brushing aside plaintiffs' redistricting claims here conform to how our court has viewed redistricting issues over many decades. The district court considered our prior caselaw and observed we have had no qualms since at least 1963 in expressing a willingness to confront these politically sensitive issues when the evidence justified it, citing *Harris*, 192 Kan. at 207 ("It is axiomatic that an apportionment act, as any other act of the legislature, is subject to the limitations contained in the [Kansas] Constitution, and where such act . . . violates the limitations of the Constitution, it is null and void and it is the duty of courts to so declare."). The district court then explained:

> "Kansas courts routinely determine manageable standards to enforce broad constitutional language—including in the redistricting context. And other states' supreme courts have successfully adjudicated similar claims under their state constitutions, offering a model for this Court to apply. *Indeed, the ample evidence of Ad Astra 2's extreme, intentional partisan bias makes this an easy case.*" (Emphasis added.)

The district court concluded "the Kansas Constitution's equal protection, free speech and assembly, and suffrage provisions provide manageable standards to adjudicate partisan gerrymandering claims." It further noted, "The key provisions here—involving equality, free speech, and suffrage—have long been the basis of litigation in state courts, from which Kansas courts can draw and provide manageable standards." And the court added, "[W]hile federal courts may be unable to hear partisan gerrymandering claims under the federal Constitution, the Kansas Constitution allows this [state] Court to hear those claims."

70

The district court then set out its decision-making criteria for the nonrace-based claims: a congressional plan constitutes a partisan gerrymander when "the Court finds, as a factual matter, (1) that the Legislature acted with the purpose of achieving partisan gain by diluting the votes of disfavored-party members, and (2) that the challenged congressional plan will have the desired effect of substantially diluting disfavored-party members' votes." The court also detailed how its analytical approach paralleled previous state caselaw:

> "Decisions from the Kansas Supreme Court considering partisan gerrymandering claims while reviewing state legislative reapportionment plans underscore this point. Although the Court has never held a redistricting plan unconstitutional on partisan gerrymandering grounds, it has repeatedly indicated that partisan gerrymandering claims are cognizable under the Kansas Constitution, and that the allegations in past cases failed *on the merits* because the challengers—unlike Plaintiffs here—had failed to offer evidence substantiating their claims. *See In re [House Bill No. 3083]*, 251 Kan. 597, 607, 836 P.2d 574 (1992) ('No evidence has been offered that would indicate the size and shape of House District 47 was engineered to cancel out the voting strength of any cognizable group or locale.'); *In re Senate Bill No. 220*, 225 Kan. 628, 637, 593 P.2d 1 (1979) (concluding that challengers had failed to 'show[]' an unconstitutional gerrymander); *In re House Bill No. 2620*, 225 Kan. 827, 834-35, 595 P.2d 334 (1979) (concluding that 'no claim or showing of gerrymandering . . . ha[d] been made'). Although these decisions did not discuss the gerrymandering allegations at great length— likely because of the lack of supporting evidence—or give clear rules for resolving future claims, none suggested that the Court lacked jurisdiction to consider the allegations. Instead, each indicated that the Legislature's discretion in redistricting is not boundless, and that Kansas courts have jurisdiction to hear partisan gerrymandering claims."

This tied back to the district court's earlier explanation as to how it thought the legal analysis should unfold:

"The court views the plaintiffs' claims as constitutional equal protection actions and finds guidance in *Farley v. Engelken,* 241 Kan. 663, 740 P.2d 1058 (Kan. 1987) pages 669-670, where three levels of scrutiny are established increasing with the importance of the right or interest involved and the sensitivity of the classification.

"In level of scrutiny from least to most:  1) rational or reasonable basis test—act presumed constitutional plaintiffs' burden to show—classification is 'irrelevant' to achievement of the state's goal, 2) heighten[ed] scrutiny—which requires the legislation to 'substantially' foster a legitimate state purpose. There must be a greater justification and a direct relationship between the classification and the state's goal, 3) strict scrutiny—applicable in cases of suspect classification including voting. No presumption of validity burden of proof shifted to defendant. Classification must be 'necessary to serve a compelling state interest' or it is unconstitutional. [Citations omitted.]"

My point is simply that the district court did not go rogue. It adopted a traditional equal protection framework firmly founded in our caselaw—triggered by its initial determination that the questioned state action, i.e., Ad Astra 2's enactment, resulted from the intentional targeting of constitutionally protected activities. This classic framework is standard fare:  (1) Plaintiffs establish a state action and its purpose or intent; (2) plaintiffs establish the state action's adverse effects on them; and, if they successfully make those showings, then (3) the State must come up with an appropriate justification for its actions subject to the applicable level of scrutiny based on the rights claimed to be injured. See, e.g., *In re Weisgerber*, 285 Kan. 98, 104, 169 P.3d 321 (2007) (equal protection violation must include demonstration that plaintiffs' treatment resulted from a "'deliberately adopted system'" that results in "intentional systematic unequal treatment"); see also *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-65, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) (explaining that equal protection claims alleging disproportionate racial impact from facially neutral legislation require "[p]roof of racially discriminatory intent or purpose"); *Washington v. Davis*, 426 U.S. 229, 244-

45, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976) (proof of discriminatory racial purpose necessary to make out equal protection claim). And the district court's application of this framework is just as ordinary. Let's explore that.

Consider first how our court has viewed its role when addressing redistricting cases before today. The Kansas Constitution's article 10, section 1 directs this court's determination every 10 years of what that article describes as "the validity" of state Senate and House legislative reapportionments. But the single word "validity" offers little or no textual guidance. Yet, this court over many years has consistently summarized its analytical role as: "For a reapportionment act of the legislature to be valid it must be valid both as to the procedure by which it became law and as to the substance of the apportionment itself to satisfy the constitutional requirements." *In re Senate Bill No. 220*, 225 Kan. 628, Syl. ¶ 2, 593 P.2d 1 (1979). But what does this second factor ("the substance of the apportionment itself") mean?

This court has repeatedly explained this substance factor includes much more than just mathematical precision for one person/one vote principles and safeguarding against race-based prejudice. It encompasses other equal protection canons as well. See *In re House Bill No. 2620*, 225 Kan. 827, Syl. ¶ 4 ("Substantially equal districts may be invidiously discriminatory because they were organized in such a way as to minimize or cancel out the voting strength of racial or political elements of the voting population."); *In re House Bill No. 3083*, 251 Kan. 597, Syl. ¶ 6 ("Lack of contiguity or compactness raises immediate questions about political gerrymandering and possible invidious discrimination that should be satisfactorily explained by some rational state policy or justification."); *In re 2002 Substitute for Senate Bill 256*, 273 Kan. 731, Syl. ¶ 4 (same).

And even before article 10 included an explicit role for the court in the redistricting process, this court referenced equal protection's arbitrary and capricious

standard as something the court would watch out for. In *Harris v. Anderson*, 196 Kan. 450, 456, 412 P.2d 457 (1966), the court noted:

> "When the [state reapportionment] Act is viewed as a whole, it is apparent that the legislature acted neither arbitrarily nor capriciously. On the contrary, the Act represents a diligent, earnest and good-faith effort on the part of the Kansas legislature to comply with this court's previous order to reapportion [the House to achieve equal-populated districts required by *Reynolds v. Sims*, 377 U.S. 533, 84 S. Ct 1362, 12 L. Ed. 2d 506 (1964)]."

So why would the application of state equal protection principles be any different today? It can't be just because this case concerns congressional district reapportionment and article 10 is silent about those districts. Our court has previously mentioned even that possibility when it said, "*The area of a congressional district* should be reasonably contiguous and compact under a proper apportionment plan and, if not, a satisfactory explanation should be given by the proponents of the plan *so as to remove any question of gerrymandering and invidious discrimination*." (Emphases added.) *In re House Bill No. 2620*, 225 Kan. at 834.

Plaintiffs' claims align with our prior caselaw despite the majority's assurance that "plaintiffs invited the district court to craft new and never before applied legal standards and tests unmoored from either the text of the Kansas Constitution or the precedents of this court." Slip op. at 5. Plaintiffs allege, and have successfully proven, that their government targeted them with this new legislation because of how they have exercised their constitutionally protected rights of political association and their right to vote, and because of the color of their skin. And they showed Ad Astra 2 accomplishes this by restructuring the method of selecting our representatives in Congress through the dismemberment of their neighborhoods, their cities, their counties, and their communities

74

of interest. The purpose, of course, was to dilute their power to vote to effectively enhance the vote of others.

Plaintiffs' claims are not "unmoored" from how our court previously viewed its role in patrolling the reapportionment landscape to protect constitutional rights. See *In re House Bill No. 2620*, 225 Kan. 827, Syl. ¶ 6 ("[A]ll courts generally agree that lack of contiguity or compactness raises immediate questions as to political gerrymandering and possible invidious discrimination."); *In re House Bill No. 3083*, 251 Kan. at 607 (same); and *In re 2002 Substitute for Senate Bill 256*, 273 Kan. 731, Syl. ¶ 4 (same). If these issues were political questions without manageable judicial standards, why would our court so consistently have bothered to even acknowledge its concern about partisan gerrymandering over so many prior decades?

The majority remains silent about that, but the answer is obvious from the caselaw. Our court has had no difficulty seeing its job as protecting constitutional rights when redistricting comes around beyond just doing the population math. It even said as much before the Kansas Constitution spelled out any explicit role for the court as it does now. See Kan Const. art. 10, § 1; *Harris*, 192 Kan. at 191. The *Harris* court struck down the 1963 apportionment of state senate districts based on failures in the constitutional process for enrolling bills and population equality. But in doing so, it acknowledged legislative discretion in redistricting remained subject to judicial limitations and expectations:

> "The exercise of discretion *and good faith by the legislature* in enacting an apportionment law must be limited to the standards provided in our Constitution and not to some other which the Constitution has not fixed. This is not to say, however, that there is not an element of discretion involved in the enactment of any legislative apportionment. Subject to the requirement of equal population provided by Article 10, Section 2, the location of boundaries, the shape, area, and other relevant factors are proper considerations for the

75

legislature in the enactment of such a statute. *Indeed, geographical considerations are necessarily attendant in the accomplishment of this purpose for the resulting districts should, where possible be compact and contain a population and area as similar as may be in its economical, political and cultural interests, all as determined by the legislature in its discretion, not acting arbitrarily or capriciously.*" (Emphases added.) 192 Kan. at 205.

So in this very early reapportionment case, in addition to simple mathematical calculations our court embedded its concerns for legislative good faith, district compactness, and maintenance of communities of interest (economic, political, and cultural), as well as an absence of arbitrary and capricious legislative conduct. And it warned,

"[W]hen legislative action exceeds the boundaries of authority limited by our Constitution, *and transgresses a sacred right guaranteed or reserved to a citizen, final decision as to invalidity of such action must rest exclusively with the courts.* In the final analysis, this court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas." (Emphasis added.) 192 Kan. at 207.

In other words, our court did not need other legislative enactments or more explicit constitutional direction to find its judicial path for ensuring protection of constitutional rights in the redistricting process. And there is more.

Two years later, this court repeated its caution against arbitrary and capricious legislative action in reapportionment. See *Harris v. Anderson*, 194 Kan. 302, 311, 400 P.2d 25 (1965). A year after that, the court paid homage to compactness and communities of interest as positive and neutral reapportioning guideposts in *Harris v. Anderson*, 196 Kan. 450, 453, 412 P.2d 457 (1966) ("The districts created by the Act are compact and contain a population and area as similar as may be in their economical, political and cultural interests."). This 1966 case ultimately held:  "When the Act is viewed as a whole,

it is apparent that the legislature acted neither arbitrarily nor capriciously." 196 Kan. at 456.

In 1974, the people amended the constitutional reapportionment article to specify that our court affirmatively determine the "validity" of legislation drawing new state senate and house districts. L. 1974, ch. 457, § 1. And in 1979 this court acted under the amended article's mandate. See *In re Senate Bill No. 220*, 225 Kan. at 633 ("The law is simple; its application is difficult."). It is a fair summary to say the court recognized a reality to the "political trappings" inherent in the legislative process of reapportionment. 225 Kan. at 634. But even so, the court did not surrender its judicial review function regarding "political gerrymandering"; it still expected justifications tied to legitimate state interests to explain where lines were drawn, such as preserving cities and counties, maintaining communities of interest, and preserving local economic interests, e.g., farming. 225 Kan. at 637. Ultimately, the court concluded: "The objection to the bill on the ground that there was partisan political gerrymandering in redistricting the senatorial districts does not reveal a fatal constitutional flaw *absent a showing of an equal protection violation. No such showing has been made*." (Emphasis added.) 225 Kan. at 637. Again, the point here is that our court did not simply abandon its judicial review when considering partisan gerrymandering claims or decry any lack of manageable judicial standards. It looked under the hood for the evidence before validation.

Similarly, that same year when addressing state House redistricting, our court again acknowledged the reality that "politics and political considerations are inseparable from districting and apportionment," but again it did not let that end the constitutional inquiry. See *In re House Bill No. 2620*, 225 Kan. 827, Syl. ¶ 4 ("Substantially equal districts may be invidiously discriminatory because they were organized in such a way as to minimize or cancel out the voting strength of racial or political elements of the voting population."). Our court held: "[A]ll courts generally agree that lack of contiguity or

77

compactness raises immediate questions as to political gerrymandering and possible invidious discrimination which should be satisfactorily explained by some rational state policy or justification." 225 Kan. 827, Syl. ¶ 6. Finally, the court noted:  "No claim or suggestion has been made by anyone that the shaping of the districts was for the purpose of minimizing or cancelling the voting strength of any racial or political element of the voting population." 225 Kan. at 835.

There would be no purpose to our court mentioning these potential claims and expressing its willingness to consider invidious discrimination in all its forms if the court believed that kind of analysis was beyond its reach as the majority now claims. The majority cannot square its retreat on this issue with our court's nine reapportionment cases since 1963. None have suggested these claims fall outside the judicial sphere for further inquiry. See *In re Substitute for House Bill 2492*, 245 Kan. 118, 125, 775 P.2d 663 (1989) ("None of the persons appearing here challenge the apportionment legislation now before us on the basis that it dilutes the vote of rural or urban voters, or other specific groups of voters, or that the districts created deviate impermissibly from 'perfect' population."); *In re House Bill No. 3083*, 251 Kan. 597, Syl. ¶ 6 ("Lack of contiguity or compactness raises immediate questions about political gerrymandering and possible invidious discrimination that should be satisfactorily explained by some rational state policy or justification."); *In re 2002 Substitute for House Bill 2625*, 273 Kan. 715, 44 P.3d 1266 (2002) (same); and *In re 2002 Substitute for House Bill 256*, 273 Kan. 731, Syl. ¶ 4, (same); see also *Harris*, 192 Kan. at 207 ("[A]n apportionment act, as any other act of the legislature, is subject to the limitations contained in the Constitution, and where such act exceeds the bounds of authority vested in the legislature and violates the limitations of the Constitution, it is null and void and it is the duty of courts to so declare.").

The majority also appears stymied at the first step of the equal protection analysis, i.e., determining whether Ad Astra 2 discriminates against similarly situated Kansans. It seems vexed with the conundrum that to "begin evaluating whether an alleged partisan gerrymander is unconstitutional, we would first need to determine what our baseline definition of 'fairness' is." Slip op. at 33. The majority says it is troubled by what it views as the lack of a discernable, legal test for deciding when "how much" political gerrymandering becomes "too much." Slip op. at 32. The majority goes on to point out that various "other states have solved this problem by codifying such clear standards in their laws." Slip op. at 33. But are they really so clear?

Among the examples the majority cites are various permutations of prohibitions on district maps which are drawn "primarily to favor or disfavor a political party." Ohio Const. art. 11, § 6; Colo. Const. art. V, § 44; see also Mich. Const. art. 4, § 6; N.Y. Const. art. 3, § 4. But how is a "favor" or "disfavor" standard less squishy than our Kansas caselaw going back more than half a century? That caselaw establishes the Legislature may not engage in "invidious" partisan gerrymandering, or that districts may not be "organized in such a way as to minimize or cancel out the voting strength of racial or political elements of the voting population . . . ." *In re House Bill No. 2620*, 225 Kan. 827, Syl. ¶ 4. And we have said when the facts indicate improper partisan gerrymandering may be present, the legislation "should be satisfactorily explained by some rational state policy or justification." *In re 2002 Substitute for Senate Bill 256*, 273 Kan. 731, Syl. ¶ 6.

What our caselaw shows is that when redistricting has a discriminatory effect on Kansas voters because of partisan affiliation or voting preferences, this violates equal protection of the laws as guaranteed by the Kansas Constitution if that action cannot withstand the appropriate level of scrutiny for the plan, i.e., if the Legislature intentionally discriminated against individuals whose viewpoints it disfavored without an

79

adequate governmental reason to explain what it did. Said differently, the answer to the majority's question of how much is too much is straightforward: partisan gerrymandering is "too much" when partisanship motivated the state action in question when there is no other legitimate rationale driving the outcome.

These standards can happily coexist with the inescapable truth that legislators entrusted by their fellow Kansans with drawing electoral districts will act to some degree in self-interest. But this obnoxious political reality does not make partisanship a legitimate government interest that justifies sweeping state action to suppress citizens' voting strength and split up their communities simply because they hold differing political viewpoints. It reflects that when there is discretion to modify voting districts within a vast range of possible outcomes, an adequate government rationale must defend the chosen path. Our Constitution must not permit discretion to become a tool for abuse of government power, allowing improper motives to prevail over all reason and be dominated by improper criteria for modifying district lines to achieve population equalization.

Viewed in this manner, our court's role is confined not to determining the best policy, but to deciding whether the Legislature's discretionary decisions can be explained by a lawful government aim. See *Gannon v. State*, 298 Kan. 1107, 1150, 319 P.3d 1196 (2014) (holding constitutional provision requiring Legislature to provide suitable financing for public K-12 schools supplied judicially discoverable and manageable standards for court review of Legislature's decision-making). In *Rucho*, the dissenting justices noted courts across the country had already formulated such a standard. They argued this standard eschews "judge-made conception[s] of electoral fairness" by using the state's own redistricting criteria as a baseline, requiring "difficult showings relating to both purpose and effects," and thereby invalidating "the most extreme, but only the most

extreme, partisan gerrymanders." *Rucho*, 139 S. Ct. at 2516 (2019) (Kagan, J., dissenting).

This rule against naked partisan discrimination is deeply embedded in our state's existing redistricting caselaw as previously discussed. I agree with the district court that adjudication of the partisan gerrymandering claims made here is not barred by the political question doctrine. And I agree with the district court's analysis of the remaining factors from *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).

*Substantial competent evidence supports the factual findings*

Recall that the district court's ultimate conclusion about Ad Astra 2's unconstitutionality is not grounded in the fact that the legislation was shrouded in secrecy, had no bipartisan support, minimized substantive public input, failed to adhere to traditional guideposts for neutral redistricting, enacted with lightning speed, showed flashes of partisanship, was initially unsettling even to members of the majority party, or followed promises of a prominent majority-party state legislator to achieve four majority-party congressional districts. Rather, these are just symptoms all pointing to a fatal diagnosis in keeping with our caselaw. See *In re House Bill No. 3083*, 251 Kan. 597, Syl. ¶ 6 ("Lack of contiguity or compactness raises immediate questions about political gerrymandering and possible invidious discrimination that should be satisfactorily explained by some rational state policy or justification.").

Defendants do little to dispute the evidentiary support for the district court's findings. But let's note the essential ones for the partisan gerrymandering claim:

- The contrast between the minimal population shifts required versus the much larger shifts that occurred is poorly explained.

81

- Ad Astra 2 creates noncompact and irregularly shaped districts despite neutral guidelines to the contrary.

- Ad Astra 2 contains numerous unnecessary political subdivisions splits, breaks up geographically compact communities of interest, and fails to preserve the cores of existing districts.

- Kansas' political geography does not explain Ad Astra 2's partisan bias. The map's partisan bias "goes beyond any 'natural' level of electoral bias caused by Kansas' political geography or the political composition of the State's voters."

- In addition to carving up communities with significant commonality, Ad Astra 2 pairs several far-flung communities that share little in common, like the City of Lawrence into CD 1. And in CD 3, Ad Astra 2 splits Wyandotte County and pairs its southern portion with Johnson, Miami, Franklin, and Anderson Counties. As a result, a large portion of the Kansas City metro area is now paired with rural areas in southern Johnson County, as well as Miami, Franklin, and Anderson Counties.

- Ad Astra 2 cannot be justified by the purported desire to keep Johnson County whole within a single congressional district to elevate a supposed community of interest constituting the entirety of Johnson County over preserving the Kansas City metro area. The argument that Ad Astra 2 is the product of a desire to keep Johnson County whole is a post hoc rationalization.

- The district lines in the areas around Kansas City and Lawrence show clear signs of purposeful redistribution of Democratic voters between districts to prevent them from effectively achieving majority status.

- Ad Astra 2 consistently places Kansans across the northeast part of the state in districts that are far more Republican than their neighborhoods.

- Ad Astra 2 was designed intentionally and effectively to maximize Republican advantage in the state's congressional delegation and amounts to an extreme, intentional pro-Republican outlier at the statewide level.

- Three of the four districts in Ad Astra 2 are extreme statistical partisan outliers. The partisan compositions of the enacted congressional districts containing Kansas City, Topeka, Shawnee, and Lawrence are extreme pro-Republican partisan outliers compared to the simulated districts produced using the Guidelines and traditional redistricting principles.

- Ad Astra 2's dilution of Democratic voting power will obstruct plaintiffs' ability to elect and support their candidates of choice.

Each of these findings is supported by the evidentiary record. They demonstrate Ad Astra 2 intentionally treats arguably indistinguishable classes of Kansas citizens differently. Namely, citizens and communities whose voting histories reflect support for non-Republican candidates have been redistributed across congressional districts to dilute those voters' effectiveness in future elections. See *Harper v. Hall*, 380 N.C. 317, 379, 868 S.E.2d 499 (2022) (discussing potential equal protection violation arising from "classifying voters on the basis of partisan affiliation so as to dilute their votes"). And this dilution is demonstrated by the court's finding, amply supported by plaintiffs' credible expert testimony, that Ad Astra 2 is not only an intentional and effective partisan gerrymander, but also an extreme partisan outlier compared to hundreds of simulated plans based on politically neutral redistricting criteria.

*Conclusions of law regarding partisan gerrymandering*

Applying the law to these facts demonstrates Ad Astra 2 violates Kansans' right to equal protection of the laws. Our court's three-step equal protection analysis is well known:

83

"[1] When the constitutionality of a statute is challenged on the basis of an equal protection violation, the first step of analysis is to determine the nature of the legislative classifications and whether the classifications result in arguably indistinguishable classes of individuals being treated differently. . . . [2] After determining the nature of the legislative classifications, a court examines the rights which are affected by the classifications. The nature of the rights dictates the level of scrutiny to be applied—either strict scrutiny, intermediate scrutiny, or the deferential scrutiny of the rational basis test. [3] The final step of the analysis requires determining whether the relationship between the classifications and the object desired to be obtained withstands the applicable level of scrutiny.

"In regard to the first step . . . an individual complaining of an equal protection violation has the burden to demonstrate that he or she is 'similarly situated' to other individuals who are being treated differently [by the Legislature.] [Citations omitted.]" *In re A.B.*, 313 Kan. 135, 145, 484 P.3d 226 (2021).

Combined with the indisputable reality that Ad Astra 2 moves far more individuals than necessary and disregards traditional criteria for compactness and communities of interest, the plaintiffs' expert witness testimony that Ad Astra 2 would have produced the same partisan outlier patterns in statewide elections from 2016 to 2020 is telling. It shows Ad Astra 2 targets individuals and their communities who voted against Republican candidates in past races for political resettlement across the state's four congressional districts. Its impact is to harm the disfavored Kansans by denying them the acknowledged benefits from adherence to neutral redistricting guidelines like the preservation of communities of interest. And this was all done to prevent these individuals' potential, future votes against Republican candidates from harming the electoral chances of preferred future candidates. This violates state constitutional protections.

84

Free speech principles under the First Amendment to the United States Constitution and section 11 of the Kansas Constitution Bill of Rights typically would dictate that governmental viewpoint discrimination triggers strict scrutiny, which requires the law be narrowly tailored to serve a compelling government interest if it is to be upheld. See, e.g., *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163-64, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) (strict scrutiny applies to both content-based regulation and facially content-neutral regulation that either "cannot be 'justified without reference to the content of the regulated speech'" or "were adopted by the government 'because of disagreement with the message [the speech] conveys'"); *Unified School Dist. No. 503 v. McKinney*, 236 Kan. 224, 235, 689 P.2d 860 (1984) (restriction on private speech subject to strict scrutiny). But we need not be as stringent as strict scrutiny here because, in keeping with the discussion of manageable judicial standards, Ad Astra 2 fails any test of scrutiny. To be sure, Ad Astra 2's intentional disparate treatment of Kansans based on past political speech is most certainly not even rationally related to a legitimate government interest.

This redesign goes far beyond attempting to safely retain the current partisan balance in the Kansas congressional delegation. See *In re 2002 Substitute for Senate Bill 256*, 273 Kan. at 722 (describing "safely retaining seats for the political parties" as a "legitimate political goal"). Indeed, the district court found Ad Astra 2 intentionally discriminates against voters on a partisan basis, noting the need to equalize district populations cannot explain the discrimination when Ad Astra 2 moves more than three voters to new districts for every one required by the math. And plaintiffs' expert testimony credibly showed the map's discriminatory effect cannot be explained by adherence to neutral criteria.

Defendants attempt to offer non-partisan justifications for Ad Astra 2, but to no avail. Their excuses are not supported by the evidentiary record. They argue the map achieves population equality; "keeps all incumbents in their current districts"; "keeps all but [four] of Kansas' 105 counties whole"; and "honors communities of interest across Kansas." But these rationalizations run headlong into the facts found by the district court. Population equality was necessary, yet the Legislature took this as a license to move any number of people it wanted, and hundreds of equally drawn alternative districts showed achieving mathematical precision was easily attainable without this most drastic redesign. Defendants fail to adequately explain this. Also, a map splitting more than three counties was shown to be a statistical outlier and contributed to the district court's conclusion that Ad Astra 2 in fact does not honor communities of interest. And while the incumbents may all continue to reside in their same districts, the evidence recited by the district court showed a motivating intent was to destroy the incumbency of Kansas' lone Democratic representative. In the end, the district court considered all rationales offered and explicitly concluded, the "asserted pretextual justifications for Ad Astra 2 . . . cannot withstand scrutiny."

People have a protected right to associate themselves with others of like-mind, and to voice their political opinions at the ballot box. See section 11 of the Kansas Constitution Bill of Rights. And when they do, they should not be treated dismissively or negatively by their government. What we are left with are facts demonstrating an intent to treat some voters differently based on the historical exercise of these constitutional rights. The facts show Ad Astra 2 was the vehicle for this governmental action, and no other rational, legitimate explanation for this treatment was or can be mustered.

In updating district lines, the levers of government were not operated to achieve permissible ends, even with some tolerance for incidental, political benefits. And lacking

86

an appropriate government interest to justify its effects, Ad Astra 2 deprives Kansans the equal protection of the laws of this state.

## RACE-BASED DISCRIMINATION DILUTING MINORITY VOTING STRENGTH

The district court also invalidated Ad Astra 2 under the Kansas Constitution because it unconstitutionally, intentionally drew districts along racial lines and intentionally diluted the votes of racial minorities. The court held that under Ad Astra 2, "the district lines are carefully tailored to split the heart of metro Kansas City—and with it nearly a century of tradition—along its most densely minority neighborhoods." The map, the court continued, "surgically targets the most heavily minority areas" by moving more than 45,000 minority voters in metro Kansas City from CD 3 to CD 2, giving CD 3—previously home to Kansas' largest minority population—the smallest minority population of any congressional district in Kansas. The district court found defendants' neutral explanations for this stark racial divide between CD 2 and CD 3 were pretextual.

Today, the majority overturns that decision because it says plaintiffs failed to show either of two things. First, CD 3 is a majority-minority single member district, which is required under federal law to bring a minority vote-dilution claim. See *Thornburg v. Gingles*, 478 U.S. 30, 50-51, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986) (To state a claim for voter dilution under the Voting Rights Act, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."). And second, that the Legislature used race as a predominant factor in choosing where to draw new district lines.

Regarding the first, the *Gingles* preconditions do not apply here because plaintiffs bring this action *under the Kansas Constitution*, not the federal Voting Rights Act. And in my review, the district court properly applied the equal protection principles set forth in section 2 of the Kansas Constitution Bill of Rights.

87

Congress enacted the Voting Rights Act of 1965 to legislatively enforce the Fifteenth Amendment to the United States Constitution and end the denial of the right to vote based on race. Pub. L. No. 89-110, 79 Stat. 437 (1965), as amended, 52 U.S.C. § 10301 et seq. (2018). The language in section 2 of the VRA closely tracked the language of the Fifteenth Amendment: "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." 79 Stat. 437.

Although the VRA's section 2 provided a basis for vote-dilution claims when passed in 1965, the United States Supreme Court generally continued to analyze vote-dilution claims under constitutional equal protection principles instead of the VRA over the next decade. See *Whitcomb v. Chavis*, 403 U.S. 124, 91 S. Ct. 1858, 29 L. Ed. 2d 363 (1971); *Burns v. Richardson*, 384 U.S. 73, 86 S. Ct. 1286, 16 L. Ed. 2d 376 (1966); *Fortson v. Dorsey*, 379 U.S. 433, 85 S. Ct. 498, 13 L. Ed. 2d 401 (1965). Under these decisions, a voting district would be unconstitutional under the Fourteenth Amendment to the United States Constitution if the facts developed in a case established the district, as drawn, would "minimize or cancel out the voting strength of racial or political elements of the voting population." *Whitcomb*, 403 U.S. at 165 (citing *Fortson*, 379 U.S. at 439, and *Burns*, 384 U.S. at 88). And the language used in these cases suggests discriminatory *effects* could support a finding of unconstitutional vote dilution.

But in 1980, a plurality of the United States Supreme Court diverged from the *Whitcomb* line of cases and held racially discriminatory laws violated the Constitution only if the laws were enacted with *intent* to discriminate. *City of Mobile v. Bolden*, 446 U.S. 55, 65-70, 100 S. Ct. 1490, 64 L. Ed. 2d 47 (1980). The Court also held section 2 of the VRA mirrored this constitutional standard. 446 U.S. at 60-61. In response to the

*Bolden* plurality, Congress amended section 2 of the VRA in 1982 to expressly ban any voting practice having a discriminatory *effect*, even if the practice was enacted for a nondiscriminatory purpose. Pub. L. 97-205, § 3, 96 Stat. 131, 134 (1982). This amended section 2 invalidated the *Bolden* discriminatory intent standard of proof for statutory racial vote-dilution claims. And because the new statutory discriminatory "results test" created a lower threshold to prove racial vote-dilution claims, almost all such claims have since been brought under the VRA.

But as reflected in *Rogers v. Lodge*, 458 U.S. 613, 102 S. Ct. 3272, 73 L. Ed. 2d 1012 (1982), the 1982 VRA amendment left *Bolden*'s intent requirement untouched in the context of constitutional racial vote-dilution claims. The *Rogers* Court held constitutional minority dilution claims are "subject to the standard of proof generally applicable to Equal Protection Clause cases." 458 U.S. at 617. The Court also held precedent "made it clear that in order for the Equal Protection Clause to be violated, 'the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose.'" 458 U.S. at 617 (citing *Washington v. Davis*, 426 U.S. 229, 240, 96 S. Ct. 2040, 48 L. Ed. 2d 597 [1976], and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S. Ct. 555, 50 L. Ed. 2d 450 [1977]). As for *Washington* and *Arlington Heights*, the Court noted:

> "Neither case involved voting dilution, but in both cases the Court observed that the requirement that racially discriminatory purpose or intent be proved applies to voting cases by relying upon, among others, *Wright v. Rockefeller*, 376 U.S. 52, 84 S. Ct. 603, 11 L. Ed. 2d 512 (1964), a districting case, to illustrate that a showing of discriminatory intent has long been required in all types of equal protection cases charging racial discrimination." 458 U.S. at 617 (citing *Arlington Heights*, 429 U.S. at 265; *Washington*, 426 U.S. at 240).

The *Rogers* Court also made clear discriminatory intent can be proved by both direct evidence and circumstantial evidence:

"'Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.' Thus determining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" 458 U.S. at 618 (citing *Arlington Heights*, 429 U.S. at 266).

The *Rogers* Court ultimately affirmed the lower courts' conclusion that a county's system of electing its Board of Commissioners at large was maintained with a discriminatory purpose. And the Court found the courts below properly considered the extensive circumstantial evidence of illegal purpose even absent direct evidence of intent to dilute minority votes. *Rogers* appears to be the last Supreme Court decision applying the standard for unconstitutional minority vote dilution, but it remains valid today and adheres to entrenched equal protection constitutional principles.

Here, plaintiffs allege—and the district court found—Ad Astra 2 intentionally dilutes minority votes in violation of the Kansas Constitution's equal protection and political power clauses. Kan. Const. Bill of Rights, §§ 1, 2. The district court began by observing that this court has construed the equal protection guarantees in section 2 to be broader than the equal protection guarantees found in the Fourteenth Amendment of the United States Constitution. The district court said this "likely means that a showing of intent is not required to establish a violation of Sections 1 and 2 of the Bill of Rights." But the court held it did not need to decide if section 2 had broader protections because "the parties agree that intentional racial discrimination is unlawful under the Kansas Constitution." And then, just like the United States Supreme Court in *Rogers*, the district court considered a host of relevant factors, made particularized factual findings, and ultimately found Ad Astra 2 intentionally dilutes minority votes and violates the Kansas Constitution.

90

The majority rejects the district court's analysis, holding the lower court applied the wrong legal standard. It insists the correct legal standard is described in *Gingles*, although it readily concedes the vote dilution claim in *Gingles* was based solely on the 1982 amendments to the federal VRA. And the majority summarily dismisses any distinction by declaring that both the constitutional and statutory claims "are undergirded by the same equal protection principles that preexist the VRA and simultaneously protect against unlawful minority vote dilution." Slip op. at 43. The majority relies on what amounts to a fleeting comment in a concurring opinion by Justice Clarence Thomas to hold the *Gingles* precondition test, which the Court developed pursuant to and based on the statutory language of the 1982 amendments to the VRA, is the correct legal standard to apply in this Kansas Constitution-based minority vote-dilution case. I disagree.

Both the analysis and the holding in *Gingles* are wholly grounded in the 1982 amendments to the VRA. 478 U.S. at 37-38 (noting the district court decided the statutory racial vote-dilution claim brought under the VRA did not reach appellees' *constitutional* claims). The Court emphasized the distinction between a constitutional claim and a statutory claim by pointing out the success of a VRA claim does not depend on an "intent to discriminate against minority voters." 478 U.S. at 44. And since the VRA requires only a showing of discriminatory *effect*, the *Gingles* Court used this three-part test to connect the effect of the multi-member scheme to the potential remedy: a single-member district map.

The underlying concepts making up the *Gingles* test are not constitutionally based and do not resemble the traditional tiers of scrutiny generally applied to analyze constitutional claims. Instead, *Gingles* involved a section 2 VRA challenge to a North Carolina legislative redistricting plan which created certain multi-member districts with significant, although not predominant, African-American populations. Plaintiffs sought smaller single-member districts, some of which would have effective majorities of

91

African-American voters. Relying exclusively on the language of amended section 2 (eliminating the intent requirement to establish a statutory violation) and the legislative history preceding the 1982 amendments, the *Gingles* plurality consolidated the statutory vote-dilution inquiry into a three-part test followed by a factual examination of the totality of the circumstances. But as a precondition to examining the totality of the circumstances, the Court held plaintiffs had to show (1) the bloc of minority voters was "sufficiently large and geographically compact" enough to constitute a majority in a single-member district; (2) the minority voters must be "politically cohesive"; and (3) the white majority must vote sufficiently as a bloc to defeat minority-preferred candidates. 478 U.S. at 50-51.

Simply put, the *Gingles* test does not apply in cases, like the one here, when the vote-dilution claim is based on traditional equal protection principles. *Gingles* applies only when a vote-dilution claim is made under the 1982 amendments to the VRA, which by the very language of the statute requires only a showing of discriminatory *effect* resulting from the challenged practice when considering the totality of the circumstances. The majority disagrees, asserting the distinction between an equal protection vote-dilution claim without a precondition requirement and a VRA vote-dilution claim with a precondition requirement is at odds with the Court's guidance in *Growe v. Emison*, 507 U.S. 25, 39-40, 113 S. Ct. 1075, 122 L. Ed. 2d 388 (1993) (citing *Gingles*, 478 U.S. at 50-51). But *Growe* is a straightforward VRA section 2 case and does not consider the separate and distinct equal protection vote-dilution claim. In *Growe*, the Supreme Court held the *Gingles* preconditions for establishing a vote-dilution claim with respect to a multimember districting plan are also necessary to establish a vote-fragmentation claim with respect to a single-member district. In so ruling, the Court determined aggrieved voters had failed to establish their VRA claim. Again, the Court analyzed the claim under the VRA and did not consider a separate and distinct equal protection vote-dilution claim.

The two other cases cited by the majority to support its assertion fare no better. The majority cites first to *Johnson v. DeSoto County Bd. of Comm'rs*, 204 F.3d 1335, 1344 (11th Cir. 2000), which stands for the legal proposition that both constitutional vote-dilution claims and VRA vote dilution claims require a showing that discriminatory intent *caused* injury. I agree. The majority also generally cites to *Lowery v. Governor of Georgia*, 506 F. Appx. 885 (11th Cir. 2013) (unpublished opinion), which is a VRA case and inapplicable to my analysis.

I would find the district court properly applied the constitutional vote-dilution analysis based on its finding of intentional race discrimination and its analysis under equal protection principles set forth in section 2 of the Kansas Constitution Bill of Rights.

At this point, we should pause to note the majority identifies two kinds of racial discrimination in redistricting prohibited by the equal protection guarantees found in section 2 of our Bill of Rights:  (1) minority vote dilution; and (2) racially motivated gerrymandering. And as the plaintiffs clarified during oral arguments, their claim is intentional minority vote dilution. But the majority analyzes racially motivated gerrymandering anyway, and in doing so mistakenly concludes the Kansas Constitution is indistinguishable from the federal VRA. Again, I disagree.

Historically, minority vote dilution and racial gerrymandering cases were distinct because the constitutionally based dilution line of cases did not, under earlier interpretations by the United States Supreme Court, require a showing of intent, while a racial gerrymander did contemplate a showing of intent. See *Whitcomb*, 403 U.S. at 165 (citing *Fortson*, 379 U.S. at 439, and *Burns*, 384 U.S. at 88) (suggesting discriminatory effects were enough to support a finding of unconstitutional vote dilution). And as explained above, a racial vote-dilution claim brought under the Constitution (unlike the

93

VRA) must now include proof of discriminatory intent, much like the intent required in a racial gerrymandering claim. See *Rogers*, 458 U.S. at 616-19.

But despite all of this, an important difference remains—racial vote-dilution claims require only that discriminatory intent be a motivating factor. On the other hand, racial gerrymandering claims, which are not at issue here, in some cases require race to be the predominant factor. See *Miller v. Johnson*, 515 U.S. 900, 916, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995); *Arlington Heights*, 429 U.S. at 265-66.

Here, the district court found Ad Astra 2 intentionally dilutes minority voting power in violation of sections 1 and 2 of the Kansas Constitution Bill of Rights. On appeal, defendants do not dispute a redistricting plan that intentionally discriminates based on race violates the Kansas Constitution. And defendants agree the intent element is satisfied if race was a factor motivating the redistricting. In other words, race need not be the only factor or even the predominant factor. As defendants say in their brief, intentional racial discrimination occurs if race "at least in part" motivated the plan. They also acknowledge discriminatory intent may be proved by either direct evidence or indirect circumstantial evidence, and evidence of racial animus is unnecessary.

But despite the parties' agreement on the proper standard of proof under the Kansas Constitution, the majority concludes defendants are wrong and that plaintiffs' racial gerrymander claim necessarily fails because of a lack of evidence showing "that race was the *predominant* factor motivating the Legislature's decision to place a significant number of voters inside or outside of a particular district." Slip op. at 47. In support of its conclusion, the majority relies on the racial gerrymander "predominant factor" test from the U.S. Supreme Court's *Miller* opinion.

94

To the extent racial *gerrymandering* is even an issue presented, I disagree with the majority's conclusion that *Miller* applies to this case. Based on United States Supreme Court precedent before the VRA, I would hold equal protection guarantees under the Kansas Constitution require strict scrutiny when purposeful discrimination based on race is a *motivating* factor for official state action. See *Arlington Heights*, 429 U.S. at 265-66. Under *Arlington Heights*, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 265. And consistent with the traditional constitutional legal standards relied on by both parties here, *Arlington Heights* made clear a plaintiff asserting an equal protection claim need not "prove that the challenged action rested solely on racially discriminatory purposes" or even that racial discrimination was "the 'dominant' or 'primary' [purpose]." 429 U.S. at 265. Rather, plaintiffs need only show "proof that a discriminatory purpose has been a motivating factor in the decision" to trigger strict scrutiny. 429 U.S. at 265-66.

The *Miller* Court repeatedly cited the legal principles from *Arlington Heights* but ultimately carved out a special exception to the motivating factor test to create a new predominant factor threshold for racial gerrymandering. The *Miller* Court substantially increased the standard of proof to trigger strict scrutiny in race discrimination voting cases without explanation or justification. And in trying to figure out why the *Miller* Court increased the *Arlington Heights* burden of proof for racial gerrymander claims, one commentator reasoned:

> "*Arlington Heights* states a rule for laws intended to burden members of historically disadvantaged groups, and *Miller* states a rule for laws intended to benefit such groups. The district challenged in *Miller* was drawn for the purpose of electing a black representative, not a white one. In such a case, a racially allocative motive might provoke strict scrutiny only when that motive eclipses all others and becomes predominant. In a case where the intent to discriminate against African Americans was a motivating factor in the drawing of a district, strict scrutiny might apply under the principle of *Arlington*

95

*Heights*." Primus, *Equal Protection and Disparate Impact: Round Three*, 117 Harv. L. Rev. 493, 545-47 (2003).

Unlike *Miller*, the racial gerrymander claim addressed by the majority alleges Ad Astra 2 was passed to burden members of historically disadvantaged groups—not to benefit them. So there is no justification here to impose the higher "predominant factor" standard of proof. I do not dispute *Miller*'s "predominant factor" standard is the prevailing law in federal Fourteenth Amendment equal protection jurisprudence under the circumstances presented in that case. But as the analysis below shows, this predominant factor standard cannot prevail under the equal protection guarantees of the Kansas Constitution.

Let's begin with the text: Section 1 of the Kansas Constitution Bill of Rights provides that "[a]ll men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Section 2 provides that "[a]ll political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit."

Over 130 years ago, the court held, "The bill of rights is something more than a mere collection of glittering generalities." *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, Syl. ¶ 1, 3 P. 284 (1884). These rights are "binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm." 31 Kan. 660, Syl. ¶ 1. Simply put, increasing the burden of proof—from showing race as a motivating factor to a predominant factor—in race discrimination voting cases conflicts with the equal rights protections in the Kansas Constitution.

As a general rule, a plaintiff who challenges a facially neutral law as a violation of equal protection must prove discriminatory intent and effect. See *Arlington Heights*, 429

96

U.S. at 264-65; *Washington*, 426 U.S. at 244-45. In the context of race discrimination, the definition of intent is self-evident: it occurs when a state engages in conduct with an intent (or motive) to discriminate against its citizens based on race. In my view, there is no justification in the Kansas Constitution for failing to strictly scrutinize laws on a showing that discriminatory intent based on race was a motivating factor for government action. To hold otherwise allows the government to enact laws motivated by race that deny its citizens equal protection of the laws without providing a compelling reason for doing so.

I would hold plaintiffs need only show "proof that a discriminatory purpose has been a motivating factor in the decision" because the federal predominant factor standard used by the majority infringes on the equal protection provisions of the Kansas Constitution. See *Arlington Heights*, 429 U.S. at 265-66. And again, defendants are on board with this standard of proof because their primary argument on appeal is that the district court improperly 'collaps[ed]' the intent and effect elements by considering the plan's racially discriminatory effects as evidence of racially discriminatory intent."

Consistent with the legal analysis in *Arlington Heights*, the district court considered various factors to determine whether plaintiffs satisfied their burden to prove intentional race discrimination—that race was a motivating factor when drawing the district lines for Ad Astra 2. The district court's intent analysis considered "the totality of the circumstances," with a focus on five "particularly relevant" factors:

"(1) whether the redistricting plan has a more negative effect on minority voters than white voters,
"(2) whether there were departures from the normal legislative process,
"(3) the events leading up to the enactment, including whether aspects of the legislative process impacted minority voters' participation,

97

"(4) whether the plan substantively departed from prior plans as it relates to minority voters, and

"(5) any historical evidence of discrimination that bears on the determination of intent."

The majority criticizes the district court's consideration of these factors, calling them "unmoored from precedent"; but the United States Supreme Court in *Arlington Heights* identified most of those factors as ones to consider when deciding when race is a motivating factor for government action. 429 U.S. at 266 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). This analysis involves inquiry into factors such as the

"impact of the official action,"

"historical background of the decision,"

"specific sequence of events leading up to the challenged decision,"

"[d]epartures from the normal procedural sequence," and

"legislative or administrative history." 429 U.S. at 266-68.

The factors used by the district court track with United States Supreme Court precedent and are proper considerations for determining racial discriminatory intent under section 2 of the Kansas Constitution Bill of Rights.

*Substantial competent evidence supports the factual findings*

Let's now turn to defendants' argument that the district court's factual findings of racially discriminatory intent and effect are not supported by substantial competent evidence.

The district court found, "Ad Astra 2 treats minority votes significantly less favorably than white voters" in CD 2 and CD 3, even when controlling for partisan

98

affiliation. The plaintiffs' expert, Dr. Loren Collingwood, testified Ad Astra 2 treats minority Democrats even less favorably than it treats white Democrats by removing minority voters from CD 3 and into CD 2 at a rate of two to one.

Dr. Collingwood conducted a performance analysis that showed Ad Astra 2's dilutive effect. Under the prior 2012 federal court map, minority voters in CD 3 successfully elected their candidate of choice in 75% of the elections in which racially polarized voting (RPV) existed. But by moving 45,000 minority voters out of CD 3 into CD 2, Ad Astra 2 completely dilutes their vote, preventing them from electing their candidate of choice in any election in which RPV is present. And the 120,000 minority voters remaining in CD 3 can only elect their candidate of choice in 25% of the elections in which RPV is present. This means Ad Astra 2 dilutes minority votes in both CD 2 and CD 3.

Dr. Collingwood's report highlighted how Ad Astra 2 achieved this result—by intentionally separating a portion of Wyandotte County from CD 3 into CD 2 that is 66.21% minority, over three times the total minority voting age population in CD 3. To replace these voters, Ad Astra 2 adds counties that are 90.3% white. Dr. Collingwood testified Ad Astra 2 is among the starkest cuts along racial lines he has ever seen. And the district court found his testimony credible.

The district court also found Ad Astra 2 "substantively departed from prior plans as it relates to minority voters," recognizing that Wyandotte and Johnson Counties have been in the same district in their entirety for 90 of the last 100 years. And courts in previous redistricting cases explicitly recognized the need to keep Wyandotte County in a single district to avoid dilution of its minority voting strength. See *Essex v. Kobach*, 874 F. Supp. 2d 1069, 1086 (D. Kan. 2012); *O'Sullivan v. Brier*, 540 F. Supp. 1200, 1204 (D. Kan. 1982).

Under Ad Astra 2, the district court found "the district lines are carefully tailored to split the heart of metro Kansas City—and with it nearly a century of tradition—along its most densely minority neighborhoods." And it went on to detail how the map "surgically targets the most heavily minority areas" by moving more than 45,000 minority voters in metro Kansas City from CD 3 to CD 2, giving CD 3—previously home to Kansas' largest minority population—the smallest minority population of any congressional district in the state.

The district court also found defendants' neutral explanations for the stark racial divide between CDs 2 and 3 pretextual. And it held Ad Astra 2 does not dilute minority votes by mistake. In other words, it was intentional.

The district court relied on the following additional evidence of racially discriminatory intent:

- Dr. Collingwood's analysis showing voting in Kansas is racially polarized with minority voters favoring Democratic candidates.
- Dr. Jowei Chen generated 1,000 race-blind plans that showed 94.9% of the neutral plans had a higher minority population than the most Democratic district in Ad Astra 2.
- Dr. Jonathan Rodden analyzed Ad Astra 2 and found minority voters moved between districts at a much higher rate than non-minority voters and placed minority voters in districts with much lower minority populations than would have occurred under neutral redistricting criteria.
- Remarks during legislative debate revealing the Legislature was "keenly aware" of how the map would affect minority voters.

And from this, the district court concluded,

"These factors together all point to the conclusion that the Legislature intended the result it achieved—districts drawn sharply along racial lines. All of this evidence—the serious and unique negative treatment of minority Democrats versus white Democrats and white Republicans, the stark racial divide evident in the map, the procedural and substantive deviations in the adoption of the plan, the Legislature's awareness of the map's effect on minority voters, and the statistical unlikelihood that Ad Astra 2's distribution of minority voters would have occurred absent intent—persuade the Court that the totality of the testimony and evidence, as well as the inferences fairly drawn therefrom, establish that Ad Astra 2 was motivated at least in part by an intent to dilute minority voting strength."

To summarize, substantial competent evidence supports the district court's factual finding that Ad Astra 2 was motivated by an intent to discriminate because of race to dilute minority voting strength. And from this juncture, the inquiry now turns to whether the record contains evidence to justify the discriminatory purpose of the law. This means the burden shifts to the State to demonstrate the legislation is narrowly tailored to achieve a compelling interest. See *Loving v. Virginia*, 388 U.S. 1, 11, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967) (racial classifications are suspect and subject to the "most rigid scrutiny"); *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954) (same); *Farley v. Engelken*, 241 Kan. 663, 667, 740 P.2d 1058 (1987) (same).

Plaintiffs' race discrimination allegations were front and center at trial, but defendants offered no witness testimony or other evidence to demonstrate Ad Astra 2 was narrowly tailored to achieve a compelling interest. Defendants' attorneys did, however, appear to offer one race-neutral justification for splitting Wyandotte County in the manner that it did, although their argument is not evidence.

Counsel sought to justify the map's features based on a legislative intent to keep Johnson County in a single congressional district as a community of interest. But the

101

district court concluded a desire to keep Johnson County whole did not justify shifting 46% of the Black population and 33% of the Hispanic population out of CD 3 and compensating for that population loss by adding counties southwest of Johnson County that are 90.3% white. And as noted previously, the district court rejected the Johnson County justification in the partisan gerrymandering context as well.

Based on the findings of fact, I agree with the district court's conclusion. I find no evidence in the record from which to conclude Ad Astra 2's intentional discrimination to dilute minority voting strength based on race was narrowly tailored to achieve a compelling state interest. And the only race-neutral justification for Ad Astra 2 shown by the evidence is an intent to engage in partisan vote dilution, which is an invidious form of discrimination that could not justify the law. And absent the necessary showing, I would affirm the district court's conclusion that Ad Astra 2 does not survive the appropriate level of scrutiny and must be redrawn.

Finally, it is important to comment on Justice Rosen's separate dissent in which he makes a solid case for taking a more expansive view of the protections offered to Kansans by section 2 of our Bill of Rights beyond those the majority embraces under federal Fourteenth Amendment jurisprudence. In my view, it is unnecessary here to incorporate his analysis to invalidate Ad Astra 2 for the reasons explained. In this litigation, all parties agreed intentional discrimination is prohibited by our Kansas Constitution Bill of Rights, and neither the text of our Constitution nor our state caselaw adopts a contrary view. But Justice Rosen's reasoning remains quite sound, if unnecessary under these facts. Regardless, his dissent simply bolsters my condemnation of Ad Astra 2.

CONCLUSION

Before wrapping up, I need to mention one other thing bothering me: the Solicitor General commented in his brief about Judge Klapper's political party affiliation as a Democrat. The Solicitor General noted Judge Klapper was elected as a district court judge in Wyandotte County in 2018 as a member of the Democratic Party and would be up for reelection this year. His suggestion seemed to be this was somehow relevant within the totality of the circumstances. He went on write that "forcing judges to play referee" with politicians inevitably leads to questions about their impartiality, and "all the more so where, as here, *the judge was elected by partisan election as a member of the party in whose favor the call went*." (Emphasis added.)

When asked about this at oral argument, the Solicitor General said, "We think it is a relevant fact that the case was decided by an elected partisan judge." Adding, "And it is the case that in this case the plaintiffs chose to file the case in a district where the . . . partisan elected judges are all members of the Democratic Party." He then made the point, "The district judge . . . basically wholesale adopted the findings and facts and conclusions of law that were submitted by the plaintiffs. . . . He essentially made virtually every ruling on contested issues of fact and law in favor of the plaintiffs."

Curiously, there was no mention a Republican governor initially appointed Judge Klapper to the district court bench to fill a mid-term vacancy in September 2013. He was then elected to full terms in both 2014 and 2018. And I would think if an argument like this had any proper purpose, this missing background might be meaningful. But to be clear, there is nothing in this court record or anything written by any member of this court raising any credible notion Judge Klapper ruled as he did based on political sympathies instead of his good-faith view of the evidence and the law.

The Solicitor Division represents the State in civil and criminal appeals. From my experience, it does so professionally. And I would be the first to concede inartful or foolish things are said in high-profile litigation. But make no mistake, this is playing with dangerous stuff. It has no place as advocacy in a Kansas courtroom without a very solid factual foundation that is wholly lacking here. See *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 963 (2d Cir. 1998) ("It is intolerable for a litigant, without any factual basis, to suggest that a judge cannot be impartial because of his or her race and political background."); see also *State v. Logan*, 236 Kan. 79, 88, 689 P.2d 778 (1984) (holding it would be "too far-reaching" to conclude judge had a "prosecution bias" because judge's son worked in a district attorney's office); *Higganbotham v. Oklahoma ex rel. Oklahoma Transp. Com'n*, 328 F.3d 638, 644 (10th Cir. 2003) (finding judge's recusal not warranted even though judge's son was married to governor's daughter, judge and governor were of the same political party, and governor was instigating political force behind the dispute); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002) (affirming trial judge's decision *not* to recuse even though judge was an Episcopal Church member and defendant was an Episcopal church.); *Karim-Panahi v. U.S. Congress*, 105 Fed. Appx. 270, 274-75 (D.C. Cir. 2004) (unpublished opinion) (affirming denial of recusal based on allegations judge was "biased because of her 'political-religious connections' and her alleged loyalty to those who selected, confirmed and appointed her"); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1076-77 (9th Cir. 1998) (fact judge contributed to law school alumni association at university affiliated with medical clinic did not require recusal in action by clinic employees alleging false claims by clinic administrators); *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1117 (4th Cir. 1988) (judge's past Sierra Club membership before appointment did not require recusal from case in which Sierra Club was a party); *United States v. State of Ala.*, 828 F.2d 1532, 1543 (11th Cir. 1987) (preappointment views expressed by judge as a political figure and state senator did not indicate he prejudged the legal question).

For the reasons explained, I would affirm the district court ruling invalidating Ad Astra 2. It violates plaintiffs' right to equal protection of the laws by targeting them and other similarly situated Kansans by intentionally diluting their voting strength, without any other appropriate, evidence-backed rationale to explain the redistricting choices made. Moreover, Ad Astra 2 unconstitutionally discriminates against Kansans by using race as a motivating factor in drawing the district lines.

ROSEN, and STANDRIDGE, JJ., join the foregoing concurring and dissenting opinion.